FILED

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

3:17mJ 1147 RAR

STATE OF CONNECTICUT        :        ss: Hartford, June 28, 2017

US DISTRICT COURT

COUNTY OF HARTFORD        :

                                    :

## AFFIDAVIT

I, Matt Kowalczyk, a Task Force Officer with the Drug Enforcement Administration,

having been duly sworn, state:

### I.        INTRODUCTION

1.        I am an investigative or law enforcement officer of the United States within the

meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United

States who is empowered by law to conduct investigations of and to make arrests for offenses

enumerated in Section 2516 of Title 18 of the United States Code.  I have been employed as a

Police Officer with the Bristol (CT) Police Department since 2005.  From October 2011 to the

present, I have been assigned to the Drug Enforcement Administration ("DEA") Hartford

Resident Office as a Task Force Officer ("TFO").

2.        As a DEA Task Force Officer, I have participated in numerous investigations

concerning violations of federal narcotics and firearms laws.  I have coordinated controlled

purchases of illegal drugs utilizing confidential sources and cooperating witnesses.  I have

obtained/participated in the execution of search and arrest warrants pertaining to individuals

involved in the distribution of controlled substances, conducted electronic surveillance and

physical surveillance of individuals involved in the distribution of controlled substances,

analyzed records documenting the purchase and sale of illegal drugs, spoken with informants and

subjects, as well as other local, state and Federal law enforcement officers, regarding the manner
in which narcotics traffickers obtain, finance, store manufacture, transport, and distribute illegal
drugs.  I have received instruction relative to conducting drug investigations while attending in-
service training at the Connecticut Police Academy (POSTC) in Meriden, CT.  In addition, I also
receive periodic in-service training relative to conducting drug investigations.

      3.     I make this Affidavit in support of criminal complaints and arrest warrants for
Henry CARABALLO, Alexander PENA, Gabriel CORDERO ("G. CORDERO"), Fernando
TOLENTINO Jr. a.k.a "HUMACAO," Gisel DE LA CRUZ, a Hispanic male referred to as
"BLUE" ("BLUE"), Edwin REYES, Joel CORDERO ("J. CORDERO"), Anthony ACOSTA,
Amarilis PIRELA; Angel RIJO-CASTILLO; a Hispanic male who previously used telephone
number 404-232-5769 and currently is using telephone number 404-493-7482 (referenced herein
as "UM5769"), Jonathan VELEZ and a Hispanic male who uses telephone number 929-303-
8415 (referenced herein as "UM8415") on charges of conspiracy to possess with intent to
distribute and to distribute heroin, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and possession
with intent to distribute and distribution of heroin, in violation of 21 U.S.C. § 841(a)(1).

      4.     I also make this affidavit in support of an application for search and seizure
warrants to search the following premises:

      a.     **280 Collins Street, Apartment #316, Hartford, CT (Subject Premises
#1):** 280 Collins Street is a red brick apartment building marked with the numbers "280" affixed
to the south street side of the building.  280 Collins St. is a four story, multiple apartment
building.  Apartment 316 is a tan colored door on the third floor of the building marked "316".

      b.     **280 Collins Street, Apartment #101, Hartford, CT (Subject Premises**

**#2):** 280 Collins St. is a red brick apartment building marked with the numbers "280" affixed to the south street side of the building.  280 Collins St. is a four story, multiple apartment building. Apartment 101 is a tan colored door on the first floor with no markings on the door.

        c.     **280 Collins Street, Apartment #401, Hartford, CT (Subject Premises #3):** 280 Collins St. is a red brick apartment building marked with the numbers "280" affixed to the south street side of the building.  280 Collins St. is a four story, multiple apartment building. Apartment 401 is a tan colored door on the fourth floor with no markings on the door.

        d.     **Neighborhood Supermarket, 316 Farmington Avenue, Hartford, CT (Subject Premises #4):** the Neighborhood Supermarket is a commercial store front located at 316 Farmington Avenue, Hartford, CT that is marked "316C" and has an Orange and Blue sign reading "Neighborhood Supermarket" affixed above the storefront.

        e.     **104 Wood Drive, East Hartford, CT (Subject Premises #5):** 104 Wood Drive is a two story home colored white with a brown roof.  There is a large white solid fence surrounding the back yard.  The number 104 is affixed to the front door area of the home.

        f.     **212 Greenwood Street, East Hartford, CT (Subject Premises #6):** 212 Greenwood Street is a single story home with light brown siding, black shutters and a brown shingled roof.  The garage door and driveway is located to the right side of the home when observing the home from the street.  There is white trim in front of the home with the number 212 displayed vertically in black numbers.

        g.     **25 Edgewood Avenue, Apartment 203, New Britain, CT (Subject Premises #7):** 25 Edgewood Ave. New Britain, CT is brick apartment building with brownish color roofing that also contains apartments for 17 Edgewood Ave.  There is a green covered

entrance with the numbers "25" in white numbers located to the left (when looking at the building) of a green covered entrance with the numbers "17" in white numbers.  When entering the front door of 25 Edgewood Ave. (under the covered entrance) and traveling up the stairs, there are four apartments, two to the right and two to the left of the hallway.  Apartment 203 is the second apartment on the right, but is unmarked on its white door.

> h.      **775 West Main Street, Unit C, Meriden, CT (Subject Premises #8):**
775 West Main Street, Meriden, CT is a multi-unit condominium/apartment complex.  Unit C has a red door and tan colored siding.  The letter "C" is affixed to the left of the door indicating the unit.

## II.    <u>RELEVANT FACTS</u>

5.      The Hartford Residence Office (HRO) of the Drug Enforcement Administration (DEA) has been involved in a long-term investigation of drug trafficking organization (DTO) that is selling large quantities of heroin, Fentanyl and other narcotics in the Hartford, CT area and elsewhere.

6.      The investigation has revealed that members of this DTO include, among others, Henry CARABALLO, Alexander PENA, Gabriel CORDERO, Fernando TOLENTINO Jr. a.k.a "HUMACAO," Gisel DE LA CRUZ, BLUE, Edwin REYES, Joel CORDERO, Anthony ACOSTA, Amarilis PIRELA; Angel RIJO-CASTILLO; UM5769, Jonathan VELEZ and UM8415.  Evidence regarding each of these members of this DTO is discussed below.  In addition, evidence regarding each of the eight **Subject Premises** is discussed below.

## EVIDENCE REGARDING HENRY CARABALLO

### A.     Controlled Purchases of Heroin from Caraballo.

7.     During this investigation, a cooperating source, who is referenced herein as "CS-1," conducted three controlled purchases of heroin from Henry CARABALLO, which are discussed below:

#### i.     Controlled purchase on 10/26/16

8.     On October 26, 2016, CS-1 conducted a controlled purchase of one gram of heroin from CARABALLO.  Prior to the transaction, CS-1 made a recorded call to CARABALLO to arrange the transaction.  Investigators observed CS-1 meet with CARABALLO and engage in a hand-to-hand transaction with CARABALLO, during which CARABALLO provided CS-1 with one gram of heroin in exchange for $65.  The heroin field tested positive for the presence of heroin.[1]

#### ii.     Controlled purchase on 11/9/16

9.     On November 9, 2016, CS-1 conducted a controlled purchase of one gram of heroin from CARABALLO.  CS-1 made a recorded call to CARABALLO to arrange the transaction.  During this call, CS-1 said, "Yo, I'm getting on the 161 bus, um, where am I going and I need I need one."  CARABALLO responded, "Alright, you remember where I saw you?"  At the transaction location, CS-1 entered the front passenger seat of CARABALLO's car and gave CARABALLO $70 in exchange for 1 gram of heroin.  CARABALLO also gave CS-1 one wax fold of heroin for CS-1 to test the quality.

---

[1]     All of the narcotics that were purchased or seized during this investigation that are discussed in this affidavit were field tested and produced positive results.

### iii.    Controlled Purchase on 1/26/17

10.    On January 26, 2017, CS-1 conducted a controlled purchase of one gram of heroin from CARABALLO.  CS-1 made a recorded call to CARABALLO to arrange the purchase of heroin.  During a subsequent text message, CARABALLO instructed CS-1 to "Go to the store (i.e., the Neighborhood Supermarket) now" to conduct the transaction.  CS-1 conducted the controlled transaction with CARABALLO in the parking lot to the Neighborhood Supermarket.  CS-1 and CARABALLO made the exchange through the front window of CARABALLO's Acura.  CARABALLO provided CS-1 with the one gram of heroin in exchange for seventy dollars.

### B.    Interceptions over Caraballo's Phone (Target Telephone 1).

11.    Between February 7, 2017 and March 8, 2017, investigators intercepted communications over cellular telephone number 860-478-5215 (Target Telephone 1), which was used by Henry CARABALLO.  Interceptions over Target Telephone 1 revealed that CARABALLO was using Target Telephone 1 to discuss and to arrange to sell narcotics (likely heroin) to multiple customers.

### EVIDENCE REGARDING ALEXANDER PENA

### A.    Controlled Purchases of Heroin from Pena (and Gisel De La Cruz).

12.    During this investigation, a cooperating source, who is referenced herein as "CS-4," conducted two controlled purchases of heroin from Alexander PENA, which are discussed below:

### i.    Controlled purchase on 1/11/17

13.    On January 17, 2017, CS-4, acting under the direction and control of

6

investigators, went to the Neighborhood Supermarket at 316 Farmington Ave. to attempt to

obtain Gabriel CORDERO's current telephone number and to attempt to purchase 10 grams of

heroin.  Inside the store, CS-4 spoke with a woman later identified by CS-4 as Gisel DE LA

CRUZ, who was sitting behind the counter of the store.  CS-4 asked to speak with "G" (Gabriel

CORDERO) and was informed by DE LA CRUZ that G. CORDERO was in the Dominican

Republic and then asked CS-4 what he/she needed.  CS-4 told DE LA CRUZ that he/she needed

"ten" (referring to ten grams of heroin).  DE LA CRUZ then utilized a cell phone to place a call.

CS-4 overheard DE LA CRUZ state that there was someone at the store who needed something.

Following the phone call, DE LA CRUZ told CS-4 that someone would be bringing the heroin to

the store and CS-4 should come back at 4:30 p.m.

    14.    At approximately 4:28 p.m., CS-4 returned to the Neighborhood Supermarket and

entered the store.  After waiting in the store for ten minutes, CS-4 stated that a Hispanic male

arrived at the store and made contact with CS-4.  CS-4 stated that the male identified himself as

"LEX."  CS-4 subsequently identified a photograph of Alexander PENA as the Hispanic male

who identified himself as "LEX."  CS-4 stated that PENA claimed to be Gabriel CORDERO's

brother.  CS-4 stated that they both exited the store and entered CS-4's vehicle.  CS-4 stated that

after getting into the vehicle, PENA handed CS-4 a clear plastic bag containing ten grams of

heroin.  CS-4 said that he/she examined the heroin and complained about the quality and asked

PENA if it was garbage or if CS-4 would be able to put something on it (cut).  PENA replied that

its good and they (users) are giving it an eight and a half (8 ½) and some are giving it a ten (10),

meaning a rating of an 8 ½ or a 10 on a scale of 1 to 10.  PENA told CS-4 that he (PENA) has a

"whole thing of it," which CS-4 understood to mean that PENA still had a full kilogram of that

particular heroin.  CS-4 stated that he/she asked when "G" (G. CORDERO) was coming back

from the Dominican Republic and PENA replied on January 31st.  CS-4 stated that he/she asked

PENA if its $65 (per gram) to which PENA affirmed.  CS-4 stated that he/she handed PENA

$650 and PENA exited the vehicle.  After making the exchange, PENA provided CS-4 with

phone number 718-502-1664 and told CS-4 that he (PENA) changes his phone number every

month.  Before leaving the area, PENA provided CS-4 with G. CORDERO's phone number

(413-209-4470) and told CS-4 that he (PENA) was holding G. CORDERO's phone for him (G.

CORDERO) while he was in the Dominican Republic.  CS-4 then drove to a predetermined

location, where CS-4 provided investigators with the approximately 10 grams of heroin that

PENA had sold to CS-4.

<b>ii.    Controlled purchase on 1/23/17</b>

15.    On January 23, 2017, CS-4 conducted a controlled purchase of 20 grams of heroin

from PENA.  CS-4 had several phone calls with PENA to arrange the deal.  Once CS-4 arrived at

316 Farmington Ave., he/she parked near the entrance to the Neighborhood Supermarket and

remained inside his/her vehicle.  Shortly after CS-4 parked in the lot, PENA exited the

Neighborhood Supermarket and entered CS-4's vehicle for a brief period of time, during which

PENA provided CS-4 with twenty grams of heroin in exchange for $1300.  After conducting the

transaction, PENA exited the vehicle and returned to Neighborhood Supermarket.  CS-4 traveled

back to a secure location, where CS-4 provided to investigators the approximately 20 grams of

heroin that PENA had sold to CS-4.

**B.**    **Interceptions over Pena's Phone (Target Telephone 4).**

16.    Between March 28, 2017 and April 10, 2017, investigators intercepted

communications over cellular telephone number 609-598-0275 (Target Telephone 4), which was

used by Alexander PENA.  Interceptions over Target Telephone 4 and other evidence revealed,

among other things, that: PENA was using Target Telephone 4 to discuss and arrange narcotics

trafficking activities; PENA discusses and coordinates narcotics trafficking activities with

Gabriel CORDERO and BLUE; PENA and Gabriel CORDERO are distributing multiple gram

quantities of heroin in the area of the Neighborhood Supermarket at 316 Farmington Ave.

(**Subject Premises #4**) and 280 Collins St., Hartford, CT; and G. CORDERO and PENA assist

each other with their heroin trafficking activities.  In addition, electronic surveillance, Title III

intercepts and physical surveillance revealed that PENA is residing at 212 Greenwood St. East

Hartford (**Subject Premises #6**).

## EVIDENCE REGARDING GABRIEL CORDERO

**A.**   **Controlled Purchases of Heroin from G. Cordero.**

17.     During this investigation, CS-4 conducted three controlled purchases of heroin

from Gabriel CORDERO, which are discussed below:

**i.**      **Controlled purchase on 2/1/17**

18.     On February 1, 2017, CS-4 conducted a controlled purchase of 10 grams of heroin

from G. CORDERO.  CS-4 traveled to the Neighborhood Supermarket at 316 Farmington Ave to

conduct the transaction.  Once in the lot, CS-4 was approached by G. CORDERO who spoke

with CS-4 while at the passenger side of his/her vehicle.  CS-4 asked for "ten" referring to ten

grams of heroin.  G. CORDERO told CS-4 he would have to go get it or maybe his "brother"

could bring it over.  G. CORDERO then told CS-4 to follow him in the red van.  G. CORDERO

then drove the red van from the lot at 316 Farmington Ave., with CS-4 following G. CORDERO,

9

to 280 Collins St.  G. CORDERO was observed entering 280 Collins St. while CS-4 remained in his/her car.  Shortly thereafter, CORDERO exited 280 Collins St. and walked to the driver's side of CS-4's vehicle.  G. CORDERO provided CS-4 with a clear plastic bag containing 10 grams of heroin in exchange for $640.  After the controlled purchase, CS-4 informed investigators that G. CORDERO told him/her that G. CORDERO currently has two kilograms of heroin.

### ii.    Controlled purchase on 2/15/17

19.    On February 15, 2017, CS-4 conducted a controlled purchase of ten grams of heroin from G. CORDERO.  During a phone call to arrange transaction, G. CORDERO told CS-4 to come to the back of 280 Collins St. to conduct the transaction.  CS-4 arrived at 280 Collins St. and parked towards the rear of the lot and placed a call to G. CORDERO.  G. CORDERO told CS-4 that he was sending someone.  At 3:22 p.m.,  a Hispanic male approximately forty to fifty years of age came out of 280 Collins St. and entered CS-4's vehicle.  The Hispanic male provided CS-4 with ten grams of heroin in exchange for $650.

### iii.    Controlled purchase on 2/24/17

20.    On February 24, 2017, CS-4 conducted a controlled purchase of 20 grams of heroin from Gabriel CORDERO.  CS-4 called G. CORDERO and arranged to purchase "a dub" (in reference to 20 grams of heroin).   G. CORDERO directed CS-4 to "Collins" in reference to 280 Collins St.  CS-4 traveled to 280 Collins Street, Hartford, CT, where he/she waited until G. CORDERO arrived in the red Honda van.  CS-4 briefly entered the building at 280 Collins St. and then G. CORDERO flagged CS-4 over to the rear door of 280 Collins Street.  CS-4 went inside the door to a hallway, where G. CORDERO provided CS-4 with 20 grams of heroin in exchange for $1300.  G. CORDERO referred to the heroin as "Fuego" and held up 5 fingers

10

stating, "I got 5 of these" (referring to the quantity of heroin). CS-4 said that G. CORDERO told

him/her that he had just got back from doing his tax paperwork and was getting back $600. CS-4

said that he/she asked G. CORDERO how he gets a tax return and G. CORDERO replied, "from

the store" (referring to Neighborhood Supermarket). CS-4 then departed the area and met with

agents at a prearranged location.

**B.      Interceptions over G. Cordero's Phone (Target Telephone 2).**

21.      Between February 23, 2017 and March 24, 2017, investigators intercepted

communications over cellular telephone number (860) 328-6397 (Target Telephone 2), which

was used by G. CORDERO to conduct his narcotics trafficking activities. Interceptions over

Target Telephone 2 and other evidence revealed, among other things, that: G. CORDERO,

BLUE, DE LA CRUZ, PENA and TOLENTINO are members of this DTO; G. CORDERO

utilizes 280 Collins St., Apartment 316 (**Subject Premises #1**) to store narcotics and narcotics

proceeds; TOLENTINO assists G. CORDERO with his narcotics trafficking activities;

TOLENTINO operates and possibly resides in 280 Collins St., Apartment 316 (**Subject**

**Premises #1**, G. CORDERO's stash location); G. CORDERO resides at 280 Collins St.,

Apartment 101 (**Subject Premises #2**), which G. CORDERO uses to stash narcotics proceeds,

narcotics) and other evidence of G. CORDERO's illegal activities; PENA and G. CORDERO

have a relationship with a male named EL TIO (UNCLE), who utilizes 280 Collins St., Apt. 401

(**Subject Premises #3**) to store narcotics; and PENA, DE LA CRUZ and G. CORDERO all

utilize the Neighborhood Supermarket, 316 Farmington Ave., Hartford, CT (**Subject Premises**

**#4**) to arrange, facilitate and conduct narcotics transactions.

22.      In addition, Title III intercepts, electronic surveillance, physical surveillance and

public records reveal that G. CORDERO lives with his girlfriend, Eliana HERNANDEZ at 280 Colllins St., Apartment 101 (**Subject Premises #2**), which G. CORDERO uses to store narcotics proceeds, narcotics and other evidence.  For example, on March 9, 2017 at approximately 7:51pm, G. CORDERO over Target Telephone 2 calls his girlfriend Eliana HERNANDEZ. During the call, G. CORDERO tells Eliana "Um… check in the drawer where the beans and the Chef Boyardee are and grab a 'thing', a Manteca [heroin] that's there and put in your pocket. You gonna see it.  Where the Chef Boyardee is.  Go check right quick."  G. CORDERO and Eliana live together at Apartment 101 (**Subject Premises #2**).  In this call, G. CORDERO is indicating that there is heroin in the apartment that G. CORDERO and Eliana share.[2]

## EVIDENCE REGARDING FERNANDO TOLENTINO

### A.     Intercepted Calls over G. Cordero's Phone.

23.     Intercepted calls over Target Telephone 2 (which was used by G. CORDERO) revealed that TOLENTINO assists G. CORDERO with his narcotics trafficking activities. TOLENTINO helps maintain and operate the stash location at 280 Collins St., Apartment 316 (**Subject Premises #1**).  TOLENTINO possibly resides at Apartment 316.  TOLENTINO stores guns on behalf of G. CORDERO and their associates.  TOLENTINO serves narcotics customers on behalf of G. CORDERO.  Examples of intercepted calls over Target Telephone 2 involving TOLENTINO include the following:

---

[2]     Many of the telephone calls and text messages intercepted over CORDERO's phones were in Spanish.  Any Spanish communications that are discussed in or set forth in this Affidavit have been translated into English.  This Affidavit summarizes and quotes these English translations.

i.       **Tolentino maintains the stash at Apartment 316.**

24.      On February 24, 2017, investigators were conducting surveillance in the area of 280 Collins St., Hartford, CT.  At approximately 1230 hrs., investigators intercepted G. CORDERO over Target Telephone 2 communicating with a male later identified as Hugo MARIERA.  MARIERA tells G. CORDERO he will see him at the store at "two o'clock on the dot" and G. CORDERO tells MARIERA that he is going to New Britain "where you [MARIERA] live."  MARIERA asks G. CORDERO if he wants to "come over here" but G. CORDERO replies "I don't like driving dirty, bro."  G. CORDERO indicates he is going to see an accountant and then G. CORDERO will meet with MARIERA to conduct what investigators believe to be a narcotics transaction.  At approximately 1238 hrs., G. CORDERO is observed leaving the lot at 280 Collins St. driving a red Honda Odyssey.  G. CORDERO travels to the Neighborhood Supermarket at 316 Farmington Ave., Hartford, CT.  At approximately 1330 hrs., G. CORDERO calls 860-478-7077 (TOLENTINO) and tells him to "..leave me the keys, *remember the keys for upstairs, for three sixteen* (**Subject Premises #1**) and the key chain."  TOLENTINO replies "I am going to leave the entire key chain and *the key for three sixteen* beside it."  G. CORDERO then directs him to leave it on top of the dresser.  At approximately 1411 hrs., investigators intercept CS-4 (who was arranging a controlled purchase) ask G. CORDERO for twenty grams of heroin, to which G. CORDERO directs CS-4 to "Collins." At approximately 1413 hrs. G. CORDERO calls TOLENTINO asking if TOLENTINO left the key.  TOLENTINO tells G. CORDERO he left him "the one (key) for *the third floor*."  At approximately 1414 hrs., MARIERA texts G. CORDERO "15 passin the store now" and G. CORDERO responds at 1415 hrs. "Collns st" and MARIERA acknowledges.

13

25.     Investigators re-established surveillance at Collins St. and observed a silver Honda Accord arrive in the lot of Collins St as G. CORDERO and MARIERA talk at 1420 hrs. and MARIERA states he is "pulling in right now." At approximately 1506 hrs., G. CORDERO is observed arriving at 280 Collins St. in the red Honda van and entering the apartment building.  Investigators observed CS-4 arrive at the apartment building to conduct the controlled purchase detailed above.  G. CORDERO has arrived at the building to conduct two narcotic transactions. At approximately 1516 hrs., G. CORDERO driving the red van, CS-4's vehicle and the silver Honda Accord all leave the lot together. Based on the CS debriefing, G. CORDERO left the building and provided heroin to both CS-4 and a Dominican male who was operating the silver Honda Accord.

26.     During these calls, I believe that both CS-4 and MARIERA contacted G. CORDERO in an attempt to obtain narcotics.  G. CORDERO, after speaking with MARIERA and two minutes after speaking with the CS, calls TOLENTINO to ensure he has left G. CORDERO the keys for Apartment 316 (**Subject Premises #1**) and TOLENTINO assures G. CORDERO he left G. CORDERO the key to the third floor.  TOLENTINO says he will leave the key for upstairs and then identifies three sixteen (**Subject Premises #1**).  (In a previous controlled purchase, G. CORDERO told CS-4, who was waiting in the lot at 280 Collins St., that G. CORDERO needed to go to the third floor.  After entering 280 Collins St. and then exiting, G. CORDERO returned to CS-4 and provided him with heroin).  Based on the calls, TOLENTINO and G. CORDERO identify the third floor once again, and specifically three sixteen (i.e., **Subject Premises #1**).  G. CORDERO resides on the first floor of the apartment building and required access to the third floor apartment (316) to obtain heroin to make heroin sales to CS-4

14

and MARIERA.

27.     On February 26, 2017, G. CORDERO arranged to sell "loose" or unbagged heroin to an unidentified male referenced herein as "UM7233." At 6:33pm, UM7233 told G. CORDERO that he is looking to gather money and will then come to see G. CORDERO. At 7:17 pm, UM7233 texts G. CORDERO: "I will see you after eating. Give it to me loose." G. CORDERO responds "ok". At 8:15 pm, UM7233 calls G. CORDERO and tells him "I have all twenty seven, I have them here." G. CORDERO tells UM7233 "…lets talk here." At 8:27 p.m., UM7233 calls G. CORDERO to tell him he has arrived and G. CORDERO tells him to park in the back by G. CORDERO's truck. Seven minutes later, G. CORDERO calls TOLENTINO and asks TOLENTINO "Where are you, HUMACAO? In the office?" TOLENTINO states yes and G. CORDERO says that he is going to meet TOLENTINO there. Investigators believe that in this call, UM7233 is looking for unbagged heroin and is telling G. CORDERO that he has twenty seven, which is likely $2700 for the amount of heroin he is looking to purchase (50 grams of heroin at $54 per gram is $2700). G. CORDERO directs him to the rear of the lot at 280 Collins St. to meet UM7233. G. CORDERO calls TOLENTINO approximately seven minutes after the arrival of UM7233 and asks if he is in the office, which investigators know based on interceptions is 280 Collins Street, Apartment 316 (**Subject Premises #1**). The affiant believes G. CORDERO is either retrieving the heroin from the apartment or returning proceeds from the deal to the apartment.

28.     At approximately 10:37 p.m. on the same date, UM7233 calls back to tell G. CORDERO that "…my peoples didn't like them," and that "my people said they burns their nose…" G. CORDERO responds "but it burns by the nose but it is good, the the the the other

way?" UM7233 states that "My peoples smells it," and later tells G. CORDERO, "I'll bring you the forty and you give the packages and I'll mix so I'll finish the ten that I have refunded, no?" G. CORDERO agrees.  In this call, the affiant believes UM7233 had people test the heroin by snorting it and the people did not like it.  G. CORDERO wanted to know about the "other way" meaning injection of the heroin.  UM7233 states his people only snort heroin.  UM7233 then tells G. CORDERO he wants to return forty grams of the heroin he purchased so that it can be re-mixed.  UM7233 states he will finish the ten grams he set aside for his people testing the product.

29.    On February 27, 2017 at approximately 1658 hrs., G. CORDERO texts TOLENTINO the following:  "Dude, I have to go up to 316." (**Subject Premises #1**).

30.    On March 5, 2017 at approximately 12:33 p.m., G. CORDERO receives a call from MARIERA.  G. CORDERO tells MARIERA to "See me at the bodega" and MARIERA agrees.  G. CORDERO asks "What did you tell me? Fifteen pesos?"  MARIERA says "Yes" and they agree to meet at the store.  The affiant believes that in this call, G. CORDERO and MARIERA are agreeing to meet at the bodega (**Subject Premises #4**) so G. CORDERO can sell MARIERA 15 grams of heroin.  Following this call, G. CORDERO immediately calls TOLENTINO and after a short social conversation tells TOLENTINO "I have to go up there right now to get something" and then says "Alright, I'm going over there. Wait for me up there. I have to go upstairs to get something."  In this call, I believe that G. CORDERO is calling TOLENTINO, who is at Apartment 316 (**Subject Premises #1**), and telling TOLENTINO to remain there because G. CORDERO needs to retrieve fifteen grams of heroin to give to MARIERA, which will be exchanged at **Subject Premises #4**.

16

ii.    **Seizure of heroin from a customer that G. Cordero served.**

31.    On March 2, 2017 at approximately 1:47 p.m., G. CORDERO receives a call from

a male later identified as Edgar QUINTANA . QUINTANA tells G. CORDERO he is around

"to check that for you." The affiant believes this to mean to check or the quality of heroin by

have some use it. At approximately 2:00 p.m., G. CORDERO calls TOLENTINO and tells

TOLENTINO "I need the keys for the apartment (**Subject Premises #1**) right now. I got to go

upstairs right now." TOLENTINO asks "The 3-16?" (i.e., **Subject Premises #1**) and G.

CORDERO responds "Yes, I need those keys right now. I'm about to go upstairs." At 2:33

p.m., QUINTANA tells G. CORDERO that he's outside. At approximately 2:34, a black BMW

arrives and pulls into the lot of 280 Collins St. G. CORDERO tells QUINTANA to "give me

some time." G. CORDERO then calls TOLENTINO at 2:40 p.m. and asks for the "keys." G.

CORDERO asks "where are you? In the third floor?" TOLENTINO tells G. CORDERO "Yeah,

it was just that I was looking for something. I will head down now." G. CORDERO responds,

"Wait for me there, because I need to go right there right now." In these calls, the affiant

believes that G. CORDERO is looking to retrieve heroin from Apartment 316 (**Subject Premises

#1**) to provide a sample of narcotics to QUINTANA. It is common for a heroin dealer to have

the heroin tested before buying a larger quantity for sale. At approximately 2:45 p.m.

investigators observe G. CORDERO approaching the black BMW, lean into the passenger side

briefly and then return to 280 Collins St.

32.    After conducting the transaction with G. CORDERO, the BMW drove away from

the lot and was surveilled by investigators. The BMW was ultimately stopped by a Hartford

Police cruiser for motor vehicle violations. During the stop, the driver of the BMW (Edgar

17

Quintana) admitted to having a firearm in the vehicle.  Investigators seized a firearm from the vehicle.  A Police K-9 conducted a sniff of the vehicle and alerted positively to the odor narcotics in the trunk, where officers recovered five cardboard boxes full of numerous wax envelopes (approximately 1,000 per box), each stamped NY GIANTS.  The wax bags were empty indicating that QUINTANA was attempting to procure heroin from G. CORDERO in a quantity great enough to fill the folds, but was first attempting to test a sample of the heroin before making a bulk purchase.  Investigators subsequently found and seized a quantity of heroin in a knotted bag, which was recovered from the passenger of the BMW, Chassidy ORTIZ. QUINTANA took responsibility for the heroin.  ORTIZ stated that while he was being pulled over by the police, QUINTANA removed the heroin from his jacket pocket and told ORTIZ to secret the heroin on her person.  The quantity of heroin recovered was consistent with what investigators would believe to be a sample quantity of heroin. QUINTANA was arrested and charged with state violations of narcotics and firearms offenses.  ORTIZ was also charged with state narcotics offenses.

### iii.     Tolentino stashes guns for G. Cordero.

33.    On March 9, 2017 at approximately 9:44 p.m., G. CORDERO calls TOLENTINO and asks where TOLENTINO is.  TOLENTINO states that he is "upstairs" (i.e., at Apartment 316, **Subject Premises #1**) charging his phone and G. CORDERO tells him that he is going to pick up TOLENTINO.  G. CORDERO goes on to state "Some people wanted to jump him [a friend of G. CORDERO's].  So, get juana."  G. CORDERO tells TOLENTINO to bring down "four gloves" and TOLENTINO agrees.  In this call, G. CORDERO is telling TOLENTINO to get a gun (the affiant understands that "juana" is a gun based on further interceptions, which are

discussed below) from **Subject Premises #1** where TOLENTINO is currently charging his phone.  There is some sort of altercation involving a friend of G. CORDERO's and he wants the gun for protection.

34.     On March 12, 2017 at approximately 2:18 p.m., G. CORDERO calls TOLENTINO and states "Bring Juana down.  And come over here. So you can get the gun for me there. So you can gather all those guys. So, [Stammers] you can go over there and grab all the guns from over there as well.  So when these dudes come down, we are going to start shooting each other right here."  TOLENTINO: "That is fine."  G. CORDERO: "Go ahead, come down." [Voices Overlap]  TOLENTINO: "I will go downstairs right now. I am getting ready."  G. CORDERO: "Go ahead, come down.  Do not come down with your woman.  Just come you, my nigga."  TOLETINO: "Yeah!"  [Voices Overlap]  G. CORDERO: "Put on the old Jordan's and come downstairs."  [Voices Overlap]  TOLENTINO: "I know, I know."  G. CORDERO: "We [Stammers] are going to get busy and all weapons will be drawn. Fuck it!"  TOLENTINO: "All right!"  In this call, I believe that G. CORDERO is telling to get guns that G. CORDERO and TOLENTINO have access to.  G. CORDERO is telling TOLENTINO to get the gun(s) from the stash location (**Subject Premises #1**).  In addition, G. CORDERO appears to be telling TOLENINTO to get "all the guns" from another location and to bring them "downstairs" to G. CORDERO's apartment (**Subject Premises #2**), so that G. CORDERO has access to them in case something happens.

### iv.     Tolentino serves heroin customers for G. Cordero.

35.     On March 13, 2017 at approximately 2:15 p.m., an unidentified male referenced herein as "UM5001" calls G. CORDERO and states "Yeah, I need six. I'm right here,"

indicating that he needs six bundles (60 bags) of heroin. G. CORDERO asks if UM5001 has the money and UM5001 states someone is coming with the money. Immediately following this call, G. CORDERO calls TOLENTINO and tells TOLENTINO that UM5001 is in the back. G. CORDERO tells TOLENTINO that "he wants six bundles" and TOLENTINO responds "Uh-huh. I give them to him from here?" G. CORDERO and TOLENTINO then have a miscommunication, followed by G. CORDERO stating "Yes, give them to him from there. Give him six bundles from there, that he is there in the back." G. CORDERO later tells TOLENTINO that UM5001 will "bring you the money back later, get his number." TOLENTINO responds, "Alright, I got you." The affiant believes that in this call G. CORDERO arranges a deal for six bundles with UM5001 and has TOLENTINO conduct the transaction by taking the six bundles from "here" (Apartment 316, **Subject Premises #1**) and providing them to UM5001 who is in the rear of the building at 280 Collins St.

### v.    Tolentino watches over G. Cordero's apartment.

36.    On March 24, 2017at approximately 1:30 p.m., G. CORDERO received a call from TOLENTINO. In the call, G. CORDERO tells TOLENTINO that he "had to step out already. Um, I'll leave something with you and the Uncle to go to Vic's." G. CORDERO then tells TOLENTINO "All right, I have to go out. Remember Eliana isn't there. Take care because you know I got money in my house (Apartment 101, **Subject Premises #2**), in the box." TOLENTINO tells G. CORDERO to "Leave me something with Uncle" and G. CORDERO states "All right, I'll leave you something with Uncle. "

37.    In this call, G. CORDERO is telling TOLENTINO he is leaving and that he has money in his apartment (Apartment 101, **Subject Premises #2**). This call shows that G.

CORDERO is keeping the money from illicit narcotics sales in his apartment (**Subject Premises #2**) in a quantity that he feels is substantial enough for TOLENTINO to keep an eye on his apartment.  TOLENTINO is telling G. CORDERO to leave something with TOLENTINO and UNCLE (an unidentified male), meaning that G. CORDERO is going to leave them narcotics. G. CORDERO tells TOLENTINO to go to "Vic's" with UNCLE while he is gone.  Investigators believe that UNCLE and TOLENTINO assist G. CORDERO in narcotics trafficking in return for money and narcotics.

### EVIDENCE REGARDING EL TIO (UNCLE) & SUBJECT PREMISES #3

38.     Intercepted communications have revealed that G. CORDERO and PENA are associates with a Hispanic male referred to as "EL TIO" (UNCLE), who assists them with their heroin trafficking activities.  UNCLE appears to serve a role similar to TOLENTINO.  UNCLE lives at 280 Collin St., Apartment 401 (**Subject Premises #3**).  UNCLE stores narcotics at **Subject Premises #3** on behalf of G. CORDERO and serves heroin customers on behalf of G. CORDERO.  Examples of intercepted calls over Target Telephone 2 involving UNCLE include the following:

**A.     <u>Uncle stores heroin and serves customers on behalf of G. Cordero.</u>**

39.     On February 25, 2017 at approximately 9:23 p.m., G. CORDERO calls TOLENTINO and states "Send me Tio's phone number" and TOLENTINO states "I'll text it to you now."  Approximately two minutes later, TOLENTINO texts G. CORDERO: "8604789447…. Tio's number."   860-478-9447 is subscribed to Daily PENA and is the number listed with the payee for the bill for Eversource electric services at 280 Collins St., Apt. 401 (**Subject Premises #3**).  In a call detailed below on March 1, 2017, PENA refers to UNCLE as

21

"DAILY."

40.   On February 28, 2017 at approximately 3:59 p.m., TOLENTINO calls G. CORDERO asking "Did you send this girl to go to Tio's house?" G. CORDERO states yes and "Because Eliana does not know where the keys are." G. CORDERO then states [U/I] the keys and take a pack, because Edgar is going over there right now." TOLENTINO tells G. CORDERO "All right. I will help her right now."  The affiant believes that in this call, G. CORDERO needs to provide a packet (1 stack of heroin) to Edgar.  G. CORDERO sent Eliana to Tio's house (Apartment 401, **Subject Premises #3**), but she did not know where the keys were located, so TOLENTINO states that he will help her open the door and retrieve the narcotics for Edgar.

41.   On February 28, 2017 at 6:16 p.m., G. CORDERO calls TOLENTINO and they discuss looking for someone on the fourth floor.  TOLENTINO states that he knocked on 410 and 414 and no one answered the door.  G. CORDERO tells TOLENTINO "It is the one as if you are going to El Tio's. Go as if you are going to El Tio's." G. CORDERO later states "So before you go down the stairs, the door that is to your left.  Right there that door."  G. CORDERO further directs TOLENTINO and TOLENTINO states "well, it is 410 that I've been telling you." While TOLENTINO and  G. CORDERO are not discussing UNCLE's specific apartment, based on this call it identifies that UNCLE's apartment is on the fourth floor of 280 Collins St., which is consistent with electrical records indicating that UNCLE ("Daily PENA") pays for the electrical services for 280 Collins St., Apt. 401 (**Subject Premises #3**).

42.   On March 1, 2017 at approximately 8:07 p.m. PENA calls G. CORDERO state that "Yo, boss! Um a friend of mine, he want a… he want to buy…he want a B real fast."  G.

CORDERO states that El Tio! Tell El Tio. El Tio has. " PENA asks "Oh for real? What, twenty?" G. CORDERO states "Twenty, yeah, whatever. Yeah. No problem." PENA then states "El Tio, DAILI? HE got some on him?" G. CORDERO states "Yeah he got some on him in the store. I don't know. He got some." In this call PENA is looking for a bundle of heroin. G. CORDERO tells PENA that UNCLE has heroin in the store (**Subject Premises #4**).

43.     On March 23, 2017 at approximately 9:19 p.m., G. CORDERO calls TOLENTINO to discuss an unidentified male who obtained narcotics from G. CORDERO, TOLENTINO and UNCLE. G. CORDERO is asking if the unidentified male cashed his check to pay them. During the call, G. CORDERO states "Alright. You gave him dope?" TOLENTINO states "They gave him 4-0." G. CORDERO asks "Did Tio give it to him?" TOLENTINO responds "Tio, yes." The affiant believes that in this call UNCLE provided 40 bags of heroin to an unidentified male on the behalf of G. CORDERO and TOLENTINO. The affiant believes that bagged heroin is maintained (and possibly bagged) by UNCLE at his apartment at 280 Collins St., Apartment 401 (**Subject Premises #3**).

44.     On March 24, 2017 at approximately 8:01 p.m., G. CORDERO calls TOLENTINO and they discuss someone named Jeff that is "sick." G. CORDERO tells TOLENTINO to "go to the bodega and tell Tio (UNCLE) to give you one." In this call, I believe that TOLENTINO is telling G. CORDERO that a male named Jeff is having withdrawal symptoms from heroin and G. CORDERO tells him to go to the bodega (**Subject Premises #4**) to get one (either one bundle, 10 bags of heroin or one stack, 100 bags of heroin) from UNCLE, who appears to be selling heroin at or near the Neighborhood Supermarket (**Subject Premises #4**).

**B.      Seizure of heroin from a customer served by Tolentino/Uncle.**

45.      On March 24, 2017 at approximately 2:16 p.m., G. CORDERO receives a call

from a male later identified as Joseph DISCENZA.  The parties greet and DISCENZA asks "you

over there?"  G. CORDERO states that he just left but "I left HUMACAO (TOLENTINO). Just

tell me when you're in the building."  DISCENZA and G. CORDERO then discuss a drug debt

and how much DISCENZA will be paying and what quantity of narcotics he will be getting from

G. CORDERO.  G. CORDERO first says, "So Imma give you only 3, then."  Later in the call, G.

CORDERO states "I'm a tell this guy to give you, um, the little 5, you know."  DISCENZA

states that he will be there in "15 minutes."  Then G. CORDERO states "I'm a call the UNCLE,

the UNCLE."  Based upon information later gained during a stop of DISCENZA, the affiant

believes that G. CORDERO was only going to give DISCENZA 3 stacks (300 bags of heroin)

then later agrees to give 5 stacks (500 bags).  When DISCENZA states he will be there in 15

minutes, G. CORDERO states he needs to call the UNCLE to obtain the bagged heroin.

46.      At 2:37 p.m., DISCENZA calls G. CORDERO to tell him "I'm going up right

now."  G. CORDERO responds "All right, let me call UNCLE."  At 2:39 p.m. G. CORDERO

calls TOLENTINO and tells TOLENTINO "Joe is there.  Call the UNCLE.  He wants 5

packets."  TOLENTINO asks "Who? Joe?"  G. CORDERO states "Yeah he's there. Call

UNCLE, because he wants 5 packets."  TOLENTINO replies "All right."  G. CORDERO then

states "UNCLE will give them to him."  TOLENTINO and G. CORDERO then have trouble

talking over one another and G. CORDERO states "Yeah call the UNCLE.  That what I'm telling

you."  TOLENTINO states "To call the UNCLE? Does he have money?"  G. CORDERO states

he has $600 and TOLENTINO asks "Okay. To give it to UNCLE?"  G. CORDERO then states

"Give him only 4 packets." G. CORDERO then states "4 packets, yes, because I need 1 for

when Justin comes by." In this call, the affiant believes that G. CORDERO has 5 stacks

(packets) or 500 bags of heroin with UNCLE and that he wants TOLENTINO to call UNCLE to

get 4 stacks to DISCENZA (or for UNCLE to give 4 stacks to DISCENZA) because he needs 1

stack for a separate customer named Justin.

      47.    At approximately 2:45 p.m., TOLENTINO calls G. CORDERO for clarification:

"You told me to give Joe 4 right?" G. CORDERO states "Yeah" and TOLENTINO asks "Is it 5

or 4…" G. CORDERO states "Yeah, but I need the other one for Justin, and I'm not there, so I

got it, like, they don't got the keys so they could get more." The affiant believes that in this call

G. CORDERO is clarifying that TOLENTINO is to provide DISCENZA with 4 stacks (400

bags) of heroin and that G. CORDERO has the keys to the apartment so UNCLE cannot get

more from **Subject Premises #1**.

      48.    Based on these calls and physical surveillance of the rear of 280 Collins St.,

investigators identified the vehicle operated by DISCENZA. Investigators followed DISCENZA

from the scene until he stopped his vehicle in Wethersfield, CT, where investigators approached

DISCENZA and spoke with him. Investigators told DISCENZA that they had observed him at

Collins St. and asked if he had any narcotics. DISCENZA then provided investigators one black

plastic shopping bag, which contained four clear plastic knotted bags. Each of the knotted bags

contained numerous wax paper folds wrapped in rubber bands. The wax folds contained

suspected heroin, which field tested positive for the presence of heroin.

      49.    Based upon the calls, and observations of DISCENZA, the affiant believes that

DISCENZA called G. CORDERO looking to purchase multiple stacks of heroin. G. CORDERO

then reached out to TOLENTINO because G. CORDERO was not present at 280 Collins St.  G.

CORDERO told TOLENTINO that UNCLE had the narcotics to provide to TOLENTINO.

TOLENTINO then retrieved the narcotics from UNCLE and provided the narcotics to

DISCENZA.  The word packet was code for "stack," meaning a quantity of 100 bags of heroin.

This call shows that G. CORDERO, TOLENTINO and UNCLE are all working together to

distribute narcotics and that TOLENTINO did not have access to Apartment 316 (**Subject

Premises #1**) while G. CORDERO was away with the keys, and that TOLENTINO needed to go

to the UNCLE who had a quantity of narcotics at his apartment (Apartment 401, **Subject

Premises #3**).

## EVIDENCE REGARDING GISEL DE LA CRUZ

50.     Based on intercepted calls and other evidence, Gisel DE LA CRUZ is a leader

within this DTO.  DE LA CRUZ resides with her boyfriend, BLUE, at 104 Wood Drive, East

Hartford, CT (**Subject Premises #5**).  Based on intercepted calls, DE LA CRUZ and BLUE have

access to sources of supply of narcotics.  DE LA CRUZ also appears to run the bodega

(Neighborhood Supermarket) at 316 Farmington Ave., Hartford, CT (**Subject Premises #4**),

which numerous members of this DTO – including DE LA CRUZ, PENA, G. CORDERO, J.

CORDERO and UNCLE – use to facilitate their narcotics trafficking activities.  Members of this

DTO use **Subject Premises #4** to store narcotics for the purpose of having heroin on hand to

conduct transactions, as a location to arrange narcotics transactions and as a location to conduct

narcotics transactions.  This is evidenced by numerous intercepted calls and multiple controlled

purchases of heroin, which are discussed in this affidavit.  For example, on June 12, 2017, J.

CORDERO told an associate, "I'm in Gisel's bodega, doing nothing, just doing

26

(selling/preparing) drugs."

51.     In addition, DE LA CRUZ helped facilitate and arrange the commission of the controlled purchase on February 17, 2017 by CS-4.  On that date, CS-4, acting under the direction and control of investigators, went to the Neighborhood Supermarket at 316 Farmington Ave. to attempt to obtain Gabriel CORDERO's current telephone number and to attempt to purchase 10 grams of heroin.  Inside the store, CS-4 spoke with a woman later identified by CS-4 as Gisel DE LA CRUZ, who was sitting behind the counter of the store.  CS-4 asked to speak with "G" (Gabriel CORDERO) and was informed by DE LA CRUZ that G. CORDERO was in the Dominican Republic and then asked CS-4 what he/she needed.  CS-4 told DE LA CRUZ that he/she needed "ten" (referring to ten grams of heroin).  DE LA CRUZ then utilized a cell phone to place a call.  CS-4 overheard DE LA CRUZ state that there was someone at the store who needed something.  Following the phone call, DE LA CRUZ told CS-4 that someone would be bringing the heroin to the store and CS-4 should come back at 4:30 p.m.  Thereafter, CS-4 conducted the controlled transaction with DE LA CRUZ's son, Alexander PENA.

52.     Between March 28, 2017 and April 25, 2017, investigators intercepted wire and electronic communications over Target Telephone 3 (860-518-9771), which was used by BLUE, and on occasion, by Gisel DE LA CRUZ to discuss narcotics trafficking activities.  An example of an intercepted call involving DE LA CRUZ is discussed below.

53.     On April 9, 2017 at approximately 6:10 p.m., investigators intercepted a call between BLUE (and Gisel DE LA CRUZ) over Target Telephone 3 and Joel CORDERO utilizing 929-280-0266.  During this call, J. CORDERO asked BLUE to put Gisel DE LA CRUZ on the phone ("Yo, Blue. Put, put Gisel on real quick").  During this call, they discussed, in part,

27

the following:  CORDERO: "Um, G… [Stammers] Just in case, have you given anything to them, to those people, anything?"  DE LA CRUZ: "To whom?"  J. CORDERO: "To these guys." DE LA CRUZ: "No. But who, what about?"  J. CORDERO: "As far as you, as far as you know, you have not given them anything?"  DE LA CRUZ: "Nuh-uh."  J. CORDERO: "All right. No, because, it was just in case. I will give something to them. It was not to give them everything, so that you guys…" [Voices Overlap]  DE LA CRUZ: "Oh, oh. Okay, okay." [Voices Overlap]  J. CORDERO: "To take out from you guys to give them."  DE LA CRUZ: "Oh, no, no. As far as I know, no."  J. CORDERO: "All right, then. If anything, talk to Alexis and ask him."  DE LA CRUZ: "Oh, all right, then. I will let you know." [Voices Overlap]  J. CORDERO: "Yeah, let me know, because I told him to come down today for him so he could take something there."  DE LA CRUZ: "Oh, okay. Let me see if I can tell him."  J. CORDERO: "But it was just in case, right? For example, if you gave them at least five (5) pesos, three (3) or something, you understand?  So you guys do not lose your money."  DE LA CRUZ: "Oh, no. I have not gone. I have not seen him, though, you know."  J. CORDERO: "No, I called him, but he has his phone off."  DE LA CRUZ: "Okay. All right."  J. CORDERO: "All right."

54.     Based on my experience and knowledge of this case, in this call I believe that J. CORDERO calls BLUE and asks to speak with Gisel DE LA CRUZ.  J. CORDERO is asking DE LA CRUZ if she has given anything to "them."  DE LA CRUZ states no and J. CORDERO confirms that DE LA CRUZ has not given "them" anything.  Here, I believe that J. CORDERO is asking DE LA CRUZ whether she provided unknown individuals with narcotics, specifically heroin.  I believe that when J. CORDERO states "if you gave them at least five pesos, three or something" he is referring to gram quantities of heroin, likely 500 or 300 grams.  J. CORDERO

28

says that he does not want DE LA CRUZ to "lose money," by providing these unknown persons

with heroin, since J. CORDERO is providing them with heroin.  DE LA CRUZ states she has

"not seen him, though, you know" meaning she has not provided the heroin.  I believe that this

type of intentional vague and coded language is common for drug dealers, especially the use of

the word "peso" in place of heroin.

## EVIDENCE REGARDING BLUE

A.   **Interceptions over Blue's Phones.**

55.     As noted above, investigators intercepted wire and electronic communications

over Target Telephone 3 (used by BLUE and DE LA CRUZ) between March 28, 2017 and April

25, 2017.  In addition, between May 24, 2017 and June 1, 2017, investigators intercepted

communications over Target Telephone 9 (609-598-0275), which previously was used by PENA

and during the referenced period was used by BLUE.  Intercepted communications over BLUE's

telephones and other evidence revealed, among other things, that: BLUE lives with his girlfriend,

Gisel DE LA CRUZ, who is a leader within this DTO and the mother of Alexander PENA;

BLUE and Gisel DE LA CRUZ reside at 104 Wood Drive, East Hartford, CT (**Subject Premises

#5**); BLUE is distributing heroin in the Hartford, CT area and beyond; BLUE discusses and

coordinates narcotics trafficking activities with Gabriel CORDERO and PENA; BLUE

communicates with Joel CORDERO and REYES regarding higher-level narcotics trafficking;

and BLUE has ties to unidentified narcotics distributors in multiple states.  An example of

BLUE's use of Target Telephone 3 is discussed below:

56.     On April 13, 2017 at approximately 9:40 p.m., investigators intercepted a call

between over Target Telephone 3 and Joel J. CORDERO over 929-280-0266.  Based on prior

interceptions over Target Telephone 3, J. CORDERO and BLUE had provided a sample of

narcotics to two parties who traveled to Hartford via small transport van.  In this call, J.

CORDERO and BLUE discuss how the parties did not like the product provided to them.  J.

CORDERO states that the product was not good because J. CORDERO had not added "F" or

Fentanyl to the heroin.  (CORDERO: "The 'F' had not arrived. . . . So, when you told me that

they need it something good... I did not put anything to that, because I can't do anything without

the 'F' remember that with mine when, I mix [P/H] it is the 'F'").  J. CORDERO states that they

were providing the heroin for sixty five dollars a gram which was of no significant profit to J.

CORDERO.  (J. CORDERO: "That's at sixty five (65) on credit.  There is no profit for no one.")

BLUE and J. CORDERO continue to discuss how they did not like the product throughout the

call and J. CORDERO insists that it was because of the presentation, or likely the color of their

heroin.  J. CORDERO says that once they saw the color of the heroin, they were not going to

take it, despite the fact they took a sample to test.  J. CORDERO then states that he gets his

product from where the males came from, which was Massachusetts.  J. CORDERO states that

he only has 3 left, which is likely a reference to 3 kilograms of heroin.  J. CORDERO says that

"F" (Fentanyl) makes for the best product and that even heroin from "Colombia" can't stand up

to Fentanyl.  Later in the call, J. CORDERO makes a statement that he just got a shipment of

Fentanyl on that date and that it is a 7 out of 10 in quality and that he got it for 55 dollars a gram.

J. CORDERO states he got 4 or 400 grams of Fentanyl.  J. CORDERO then says "If it isn't

dropping people, it doesn't have anything" which is a crude way of saying if people are not

overdosing on the product than it is not good quality.

**B.**     **Seizure of a Kilogram of Heroin from Vanmourik's Car.**

57.     On April 23, 2017, intercepts over BLUE's phone 860-518-9771 indicated that BLUE was coordinating a significant narcotics transaction between individuals in Connecticut and Massachusetts.   Intercepted communications indicated that BLUE was going to travel to an unknown location with "El Gringo" (later identified as Jeffrey VANMOURIK) to obtain narcotics for Joel CORDERO. J. CORDERO was attempting to obtain "one" (i.e., one kilogram of heroin). Based on intercepted calls, J. CORDERO wanted more than one, but BLUE said there was "only one" where he is going, and that the individuals BLUE is dealing with have more kilograms of heroin, just at different locations.   Investigators followed BLUE and VANMOURIK as they left 316 Farmington Ave. Neighborhood Supermarket in a rented Jeep Cherokee driven by VANMOURIK and traveled to Worcester, Massachusetts, where BLUE met with unidentified Hispanic males in a bodega.   VANMOURIK remained in the vehicle except for a brief period where he entered the bodega.   Investigators believe that VANMOURIK was testing the heroin in the bodega.   VANMOURIK and BLUE then left the area and drove to a separate location (investigators were unable to observe the meeting) where couriers delivered heroin to BLUE to transport in VANMOURIK's vehicle.   At the meeting, BLUE obtained a secondary vehicle which he used to follow VANMOURIK back.

58.     While traveling back to Connecticut, BLUE told J. CORDERO that "he [VANMOURIK] is going there [the bodega] with everything."   J. CORDERO replies that is fine but they are in the store…" (i.e., inside the Neighborhood Grocery) and BLUE replies "Yeah, so then tell El Gringo [VANMOURIK] to go over there, it is better that you guys will see each other there."   Investigators asked the Connecticut State Police to conduct a car stop for motor vehicle

violations on I-84 East in East Hartford, CT. During the stop, the state trooper searched the vehicle and found approximately 1 kilogram of heroin wrapped and packaged in the rear of the vehicle. During the stop, BLUE appears to continually drive by the stop and is intercepted talking with J. CORDERO about how the car stop is progressing. J. CORDERO is upset when BLUE tells him that the police took VANMOURIK out of the car and J. CORDERO states "Fuck, there is problems, it they took him out of the SUV brother." J. CORDERO then states "Ah, no. That is it, that guy is busted." Approximately ten minutes later J. CORDERO tells BLUE, "Bro drop that [the cell phone] do not call anymore. They are going to take him. He is imprisoned, he is gone. I am picking up here, so no more." J. CORDERO is telling BLUE to drop his phone and J. CORDERO is removing drugs from whatever location he is at in anticipation of police arriving. Both J. CORDERO and BLUE subsequently disposed of their telephones.

## EVIDENCE REGARDING EDWIN REYES

59.     During this investigation, REYES appeared to use multiple cellular telephones. During the period that investigators intercepted calls over Target Telephone 3, REYES used cellular telephone number 646-923-4809 to conduct his narcotics trafficking activities. Investigators intercepted numerous calls between BLUE and REYES, during which they discussed narcotics trafficking activities. Examples of intercepted calls between BLUE over Target Telephone 3 and REYES over 646-923-4809 include the following:

60.     On March 30, 2017 at approximately 9:04 pm, BLUE called REYES and they discussed the following:

REYES:      Tell me, man.

BLUE:       Look, [Stammers] do you have people for the, for the other system? For that of Pedrito? [Background: Music.]

32

REYES:      If I have what?

BLUE:       People, people to [Stammers] get their hands on it.

REYES:      Oh, yeah.  There in the City that is what they ask me for the most.
            [Background: Music.]

BLUE:       Oh, alright.  I have a buddy that [Short Pause] that I believe is around
            there Jersey. I do not know if tomorrow or the day after. He is going to
            bring me four (4) "pesos". [Background: Music.]

REYES:      Okay. Yeah, if the numbers are right, I can help you at least there for
            [Background: Music.][Short Pause] [Voices Overlap]

BLUE:       What numbers are you talking in all? [Voices Overlap] What numbers are
            you talking about then? [Background: Music.]

REYES:      Ah... [Voices Overlap] [Background: Music.]

BLUE:       Because, it went up [Stammers] it went up. It went up a lot.

REYES:      Is that true? [Background: Music.]

BLUE:       Mm-hmm. Ask on the street, so you can see.

REYES:      But the, the Americans right? Is what you are telling me?

BLUE:       Mm-mmm.

REYES:      Alright. [Background: Music.] Well then... [Stammers] [Voices Overlap]

BLUE:       Alright. [Voices Overlap]

REYES:      I am going, I am going to call a friend who [Stammers] sees me the most
            for that.[Background: Music.] To see, where he is at.

BLUE:       [Background: Music.] Ask and see and [Stammers] you hit me up.
            [Background: Music.]

REYES:      That is fine, okay.

BLUE:       Alright. [Background: Music.]

61.    Based on my training, experience and information developed during this

investigation, in this call I believe that BLUE is calling REYES asking for "Pedrito," which I

33

believe is likely Fentanyl.  REYES says that he has a guy in New York City ("the City") who can

provide Fentanyl.  BLUE says that he is getting "four pesos," which I believe is a reference to

four kilograms of heroin, from "a buddy" in New Jersey.  REYES states that he will buy some

also (i.e., from BLUE's buddy in New Jersey), "if the numbers are right" meaning if it the price

of the heroin is good.  BLUE tells REYES the prices are increasing ("it went up a lot").  REYES

says that he will call around for the substance (likely, Fentanyl) and let BLUE know.  I believe

that BLUE most likely is looking for Fentanyl to cut the heroin (i.e., the "four pesos" from

BLUE's buddy in New Jersey) to increase the profits and potency of the product.

    62.    On March 30, 2017 at approximately 9:45 pm, REYES called BLUE and they

discussed the following:

| | |
|---|---|
| BLUE: | Talk to me. |
| REYES: | Dude, um, if you can accommodate me, I can take the four (4) for a week. |
| BLUE: | I am going to speak with the person to see. [Voices Overlap] |
| REYES: | What number did they give you, more or less? |
| BLUE: | I will see what they tell me later, because my friend is, he told me he has to because that is in New Jersey. [Voices Overlap] |
| REYES: | Uh-huh. |
| BLUE: | He is in Atlanta, solving something over there. |
| REYES: | Oh, I thought he was coming in the same truck from Saturday. |
| BLUE: | Yeah, no, no. That was a different errand. But that is for Saturday, I think. It might be. am going to speak with him to see what he says. |
| REYES: | [Stammers] Get comfortable. I have some people there that can solve that quickly. They can grab the four (4) or three (3) a week. |
| BLUE: | All right, all right. |

REYES:      That was what this man messed up for me. He took six (6) of those and he got in a mess.  Moreover, he got me in trouble.

BLUE:       Okay. Okay, okay. And, do those people always have something there?

REYES:      He said that in three (3) days, he can give you half. They are people… Listen, these are good people. They are serious people. They are people that, you understand? They are mine, mine, mine. There will be no problems with them.

BLUE:       All right, let me see if my friend.

REYES:      In three (3) days half, and [Stammers] You know. That is why he gave me a week to solve everything.

BLUE:       All right. How does that… to you, you know, [U/I] that?

REYES:      To me? It is convenient to me if you put it for me at three-zero (3-0).

BLUE:       Wow.

REYES:      To me, because I am, I am going to give it to him with the one (1). I am only getting one (1) there.

BLUE:       Let me see what he thinks, because I do not do a lot there, no.

REYES:      Really?

BLUE:       I do not do a lot there, no.

REYES:      Tell him that it is quick, understand? [Stammers] That in a week. To put it more comfortable, because they move that quickly.

BLUE:       Yeah, but you that to put it more comfortable… Twenty-nine (29) [U/I] that number. [Stammers] We would have to get it from Atlanta.

REYES:      [Stammers] Fight it a little to see. Fight it a little to see, to see if you can accomplish it, and let me know later, then.

BLUE:       All right, all right.

REYES:      All right, enough said.

63.     Based on my training, experience and information developed during this

investigation, in this call I believe that REYES is asking BLUE if REYES can "take the four" (in

35

reference to four kilograms of narcotics) on credit "for a week."  REYES asks what the cost is for the narcotics (likely heroin).  BLUE says that he has to check with his friend (i.e., BLUE's associate/buddy who has the four kilograms in New Jersey).  BLUE says his friend is currently in Atlanta, but the product is in New Jersey.  REYES says that he has people (customers or associates) who can sell it quickly.  REYES says his customers/associates "can grab the four (4) or three (3) a week," meaning that they can move or sell three to four kilograms per week. REYES says that his people will pay for half of the product in three days ("in three days, he can give you half").  REYES assures BLUE that these people are "serious" and they are close associates of REYES.  REYES again says that his people can sell everything in a week ("a week to solve everything").  REYES says that it would be good if BLUE could give it to REYES for "3-0," which I believe is likely a reference to $30,000 per kilogram.  When REYES says, "I am going to give it to him with the one.  I am only getting one there," I believe that REYES is saying that he is only selling it to his associate for $1,000 more per kilogram and, thus, REYES is only making $1,000 per kilogram.  BLUE says that he will check with his friend about getting it for "29" (which I believe is a reference to $29,000 per kilogram).

64.    On March 31, 2017 at approximately 10:03 pm, REYES called BLUE and they discussed waiting for an unknown person to drop off narcotics.  During this call, REYES references his Porsche "Panamera," which REYES is traveling to pick up in New York City.  On January 1, 2017, REYES reported to the New York City Police Department that his 2011 Black Panamera (the same vehicle investigators physically surveilled REYES operating) had been stolen.  The Panamera was subsequently recovered in New Jersey.

65.     On April 3, 2017 at approximately 11:54am, REYES called BLUE and they discussed a fight between "JO JO" (Joel CORDERO) and "GORDO" (Gabriel CORDERO), during which GORDO shot at JO-JO's silver Audi SUV (Joel CORDERO has been observed driving a silver Audi SUV). It appears that the brothers were fighting over an outstanding drug debt and BLUE had to step in to make sure no one got hurt. They discuss how GORDO (Gabriel CORDERO) is a bad customer and doesn't pay quickly, and that "JOEY" (Joel CORDERO) has paid GORDO's debts in the past. REYES tells a story of how GORDO stated he had ten "F" (which is a reference to a quantity of Fentanyl, possibly 10 grams). REYES told GORDO to give some to JOEY (Joel CORDERO) because he needs to "fix one," meaning cut a kilogram of heroin with Fentanyl to make it good product, and that REYES also has one kilogram to "fix." REYES and BLUE talk about how unreliable GORDO is and how they need to get money together. REYES says that GORDO owes him 30 or 28 pesos, which I believe is $30,000 or $28,000 for an outstanding drug debt. Later in the call, REYES states he will talk to both GORDO and JO-JO to help them make up because REYES knows both of them.

66.     On April 4, 2017 at approximately 1:36pm, REYES called BLUE and they discussed a source of supply named "Little Face." BLUE wants to know how much the game or the product is going for and REYES tells him its going to be a good price. It appears that BLUE is going to be transporting something (likely narcotics) arranged by REYES and that BLUE will be accompanied by armed people ("the people you are going with over there, is going to be armed"). REYES asks about some narcotics that BLUE is going to send REYES and they discuss the price of the courier. REYES asks if the price of the courier is the same as when REYES gave BLUE "one." REYES wants the courier to be someone known so that he can keep

37

in contact with him.  They then discuss "Little Face" who has just reappeared and REYES says

that he and BLUE should get involved with Little Face's product quickly and not let it go "cold."

BLUE inquires on the temperature and REYES states around 34, 35, 33, 32, most likely in

reference to the price per kilogram (i.e., $32,000 per kilogram) of the narcotics.  BLUE says that

"around 33, 34, 35" is a good price for REYES, but REYES says the Uncle "will go really

cheap."  REYES encourages BLUE to follow up with Little Face and tell REYES if BLUE

contacts him.

      67.     On April 20, 2017, New York investigators arrested Edwin REYES and two other

males in the Bronx, NY in connection with the seizure of approximately 500 grams of heroin.

Investigators observed REYES arrive at a parking lot (i.e., the location of a controlled

transaction) and park his vehicle in front of a vehicle driven by the two other males who had

transported 500 grams of heroin to the parking lot to conduct a narcotics transaction with a

confidential source.  Investigators observed REYES speaking with one of the males prior to the

narcotics transaction.  At the time of his arrest, investigators seized a cellular telephone from

REYES.  Investigators obtained a search warrant for REYES cellular telephone.  The number for

the cellular telephone that investigators seized from REYES was "646-923-4809" (i.e., the same

telephone number that REYES used to communicate with BLUE over Target Telephone 3.)

When investigators searched the phone, they found numerous drug related text messages with

Johnathan VELEZ's cellular telephone.

### EVIDENCE REGARDING J. CORDERO & ACOSTA

**A.**     **Controlled Purchases of Heroin from J. Cordero & Acosta.**

      68.     During this investigation, CS-4 conducted three controlled purchases of heroin

from Joel CORDERO, which are discussed below. During the first two controlled purchases,
Anthony ACOSTA conducted the hand-to-hand transaction with CS-4.

### i.        Controlled purchase on 5/4/17.

69.     On May 3, 2017, CS-4, under the direction of investigators, met with Joel
CORDERO. During the meeting, J. CORDERO expressed an interest in selling 100 grams of
heroin to CS-4.

70.     On May 4, 2017, CS-4 conducted a controlled purchase of 20 grams of heroin
from J. CORDERO and ACOSTA. CS-4, under the direction of investigators, called J.
CORDERO to arrange the heroin transaction. J. CORDERO directed CS-4 to meet with his drug
courier/associate, who was subsequently identified as ACOSTA. Initially, ACOSTA told CS-4
to go to 280 Collins St., Hartford, CT, which is a narcotics stash/distribution location used by
Joel CORDERO and other members of this DTO. Following these calls, there was an exchange
of phone calls between CS-4, the drug courier and Joel CORDERO, during which the drug
courier and Joel CORDERO told CS-4 that there was no one at Collins St. who could provide
CS-4 with the heroin. Ultimately, ACOSTA directed CS-4 to 17 Edgewood Ave., New Britain,
CT to conduct the transaction. When CS-4 arrived in the area of 17 Edgewood Ave. and 25
Edgewood Ave. (which are adjoining apartment buildings), ACOSTA directed CS-4 to the rear
of the building. CS-4 met with the courier (who CS-4 subsequently identified as ACOSTA) in
the common area of the building at 17/25 Edgewood Ave., New Britain. CS-4 provided
ACOSTA with $1400 in exchange for approximately 20 grams of heroin. ACOSTA told CS-4
that "it's fire," meaning its good quality heroin.

71.     Telephone records revealed that the drug courier's telephone (860-829-7780) is

39

subscribed to Carmen NIEVES of 25 Edgewood Ave. New Britain.  On March 24, 2017,

investigators stopped Carmen NIEVES for motor vehicle violations after she was observed

meeting with Gabriel CORDERO at 280 Collins St.  Investigators identified NIEVES, as well as

her passenger, who provided an Italian passport with the name Anthony Leonardo ACOSTA.

No charges resulted from the stop.  Investigators showed CS-4 a photograph of ACOSTA and

CS-4 identified ACOSTA as "100 percent" the male who provided the 20 grams of heroin to CS-

4 at 17/25 Edgewood Ave.

ii.     **Controlled purchase on 6/7/17.**

72.     On June 7, 2017, CS-4 conducted a controlled purchase of 20 grams of heroin

from J. CORDERO and ACOSTA.  To arrange the transaction, CS-4 called J. CORDERO and

told him that CS-4 needed "20" (20 grams of heroin).  J. CORDERO told CS-4 to come to 25

Edgewood Ave.  When CS-4 pulled in the rear at 25 Edgewood Ave., J. CORDERO directed

CS-4 to the back door at 25 Edgewood Ave.  ACOSTA came to the back door and handed CS-4

a clear plastic knotted bag containing what ACOSTA told the CS was "30" (grams of heroin).

CS-4 stated that he/she examined the heroin and told ACOSTA it's "touched" (has cut added to

the heroin).  CS-4 stated ACOSTA told him/her that it was pure (good quality heroin).  CS-4 told

ACOSTA he/she only needed 20 grams because he/she was handing it right off to a "Lick"

(customer).  CS-4 stated ACOSTA went back inside 25 Edgewood Avenue, and returned a short

time later handing CS-4 a clear knotted bag containing 20 grams of heroin in exchange for

$1,300.  The CS stated ACOSTA did not count the money and went back inside 25 Edgewood

Avenue.  CS-4 left the area and drove to a predetermined location, where CS-4 provided the

evidence to investigators.

### iii.    Controlled purchase on 6/13/17.

73.    On June 13, 2017, CS-4 conducted a controlled purchase of 40 grams of heroin

from J. CORDERO.  CS-4 called J. CORDERO to arrange to purchase 30 (grams of heroin).  J.

CORDERO and the CS agree on meeting at Collins Street (280 Collins Street, Hartford, CT).

When CS-4 arrived at 280 Collins St., CS-4 texted J. CORDERO "Here," indicating that CS-4

was at 280 Collins Street.  CS-4 walked to the rear door of 280 Collins Street.  CS-4 stated J.

CORDERO opened the door and CS-4 followed J. CORDERO to the stairwell.  CS-4 handed J.

CORDERO $1,960. The CS stated CORDERO held the money and the heroin that J. CORDERO

was going to sell to CS-4 and stated that this is the money for 30 (grams of heroin) and this is 40

(grams of heroin) for you.  J. CORDERO then handed the heroin to CS-4.  CS-4 stated he/she

asked J. CORDERO if CS-4 owes for the extra 10 grams of heroin and J. CORDERO told the CS

that it was for CS-4 to have free of charge.  CS-4 said that J. CORDERO told the CS that when

CS-4 returns for 40 (grams of heroin), J. CORDERO will give the CS 40 (grams of heroin) on

top of it.  CS-4 stated he/she shook hands with J. CORDERO and J. CORDERO stated, "don't

worry about nothing, I got you".  CS-4 then left 280 Collins St. and traveled to a secure location

to relinquish the evidence to investigators.

### B.    Interceptions over J. Cordero's Phones.

74.    Between May 11, 2017 and May 17, 2017, investigators intercepted

communications over a cell phone, 860-478-4499 (Target Telephone 7), that was used by J.

CORDERO to facilitate his narcotics trafficking activities.  Between May 24, 2017 and the date

of this affidavit, investigators have intercepted communications over another cell phone, (413)

374-5903 (Target Telephone 8), that currently is being used by J. CORDERO to facilitate his

narcotics trafficking activities.

75.     Interceptions over Target Telephones 7 and 8, along with other evidence, have revealed, among other things, that: J. CORDERO is a large-scale narcotics dealer, who is distributing large amounts of heroin and Fentanyl; J. CORDERO and his associates distribute heroin out of the Neighborhood Supermarket at 316 Farmington Ave., Hartford, CT (**Subject Premises #4**); during this investigation, J. CORDERO was stashing narcotics at, and selling narcotics from, 17/25 Edgewood Ave. in New Britain, CT; ACOSTA assisted J. CORDERO with his narcotics trafficking activities by serving customers, and receiving narcotics shipments, on behalf of J. CORDERO; J. CORDERO currently is stashing narcotics at and distributing narcotics from 280 Collins Street in Hartford, CT; Amarilis PIRELA, is a close associate of J. CORDERO, who sells heroin that she obtains from J. CORDERO; UM5769 is a source of supply of heroin and Fentanyl for Joel CORDERO and RIJO-CASTILLO is a transporter or a courier for UM5769; UM8415 is a close associate of J. CORDERO, who assists J. CORDERO with his narcotics trafficking activities; and Jonathan VELEZ, a.k.a. "Jay" or "King Jay," assists J. CORDERO with his narcotics trafficking activities and is a customer, who distributes heroin that VELEZ obtains from J. CORDERO.

C.      **J. Cordero moved his stash to 280 Collins St.**

76.     Attempting to identify the apartment that Joel CORDERO was utilizing as a stash and to gather a description of the apartment at 25 Edgewood Ave. in New Britain, investigators had an undercover police officer ("UC") enter the building.  After the UC entered the building, members of the DTO became concerned that there was someone unknown in the building.  J. CORDERO was intercepted on the telephone stating that he was concerned that someone was

42

attempting to rob him.  Although not concerned that it was a police officer, J. CORDERO made

references to the idea of changing apartments.  Over the next week, investigators realized that J.

CORDERO was moving his heroin from his stash at 25 Edgewood Ave. in New Britain and

storing it in an unknown location until he could find a new apartment.  During the following

week, investigators intercepted calls with Joel CORDERO speaking to Abraham REYES, the

superintendent of 280 Collins St. in Hartford about obtaining an apartment within that building.

During the day of June 13, 2017, Joel CORDERO told Anthony ACOSTA in a call that they are

going to have to move back to "Collins St."  Thereafter, J. CORDERO started to operate his

heroin trafficking activities out of 280 Collins St.

        77.     After J. CORDERO started renting or using an apartment 280 Collins St., it

appears that J. CORDERO has employed TOLENTINO in a capacity similar to the way that G.

CORDERO used TOLENTINO.  On June 19, 2017, investigators conducting surveillance

observed TOLENTINO walking around the building.   TOLENTINO was intercepted over J.

CORDERO's telephone and identified himself via text as HUMACAO.  In subsequent

communications, J. CORDERO has appeared to employ TOLENTINO as a "look out" whose job

it is to walk around the building and look out for vehicles that may contain police or hostile drug

dealers.  On June 18, 2017, J. CORDERO and TOLENTINO have a conversation in which J.

CORDERO states "Alright.  There's a weird car with a guy in the front of it" and then J.

CORDERO states "In the front, there's a guy in a car there with the windows tinted."

TOLENTINO tells J. CORDERO "He's waiting for TIO [UNCLE, who resides at **Subject**

**Premises #3**].  That's the one that's with TIO." J. CORDERO responds "Ok."  Later in the

conversation, J. CORDERO tells TOLENTINO to be "alert" and that "we cannot be sleeping on

43

anything." J. CORDERO goes on to say "I am not El GORDO (Gabriel CORDERO). I will not stand for that. I take care of it, buddy."

## EVIDENCE REGARDING PIRELA

78.     During Title III interceptions over J. CORDERO's phones, investigators have intercepted numerous communications between J. CORDERO and PIRELA, during which they discuss narcotics trafficking activities.   Examples of intercepted communications between CORDERO and PIRELA include the following:

79.     On May 28, 2017 at approximately 8:04 p.m., investigators intercepted the following call between Joel CORDERO over Target Telephone 8 and PIRELA using (413) 539-8561:

|  |  |
|---|---|
| CORDERO: | [Aside: The whole pack.] |
| PIRELA: | Quick question. [Voices Overlap] |
| CORDERO: | Tell me. [Voices Overlap] |
| PIRELA: | Do I have to give you 32-5 again? |
| CORDERO: | What was that my love? |
| PIRELA: | Do I have to make the 32-5 again? |
| CORDERO: | Well, normally is 40 that we always put in together. But, yeah... I mean, you can give me whatever you... [Voices Overlap] |
| PIRELA: | So, I got to you give you 40 again?! |
| CORDERO: | Well, normally that is what you always give me! 40! This... this time you didn't give me 40. You only gave me 32-5. It didn't matter! 'Cause I still have the "F". [VoicesOverlap] |
| PIRELA: | Okay. Is that... Is that... Is that it does not add up to 40, because 40 and 40 are 80! |

44

CORDERO:    Okay, hello! You and I put it 10 for the "F" beforehand! And we grab the, the, the, the whole piece, in cash!

PIRELA:     Are you serious?!

CORDERO:    But, that is what we always do, my love!

PIRELA:     I'm no longer going to invest!

CORDERO:    Well that is fine, my love. You don't have to invest.

PIRELA:     I'm not. Just give me for 200 and I'll get rid of them.

CORDERO:    That is fine.

PIRELA:     Because, I'm not making... I don't make money!

CORDERO:    Yes, you do make money! How you figure out... [Voices Overlap]

PIRELA:     No, I don't! Because right now... Okay, what I have on the street and what I have down(stairs), I will make 41. And you saying that I gotta give you 40!

CORDERO:    How is that you are going to make 41? That is impossible.

PIRELA:     Ah, well I don't know!

CORDERO:    Do the math, that is impossible. 375 at..., at 2-50, look.

PIRELA:     Remember that not everyone pays me at 2-50. So remember that I take a loss...[Voices Overlap]

CORDERO:    That's 90... [Voices Overlap]

PIRELA:     At 200... [Voices Overlap]

CORDERO:    That is 9... [Voices Overlap]

PIRELA:     Oh my God! No everyone pays me at 2-50! So what I do is that I take yours with mine. So I don't move with 23, like you move with the 23.

CORDERO:    I didn't understand. What 23 are you talking to me about?

PIRELA:     Okay! You want me to throw them all at 2-50 and that makes the 23 for you and the 23 for me, okay. I have people that pay it at

200, so when I have that 50 dollar loss for every pair they take, I cover it (loss) with mine (profit). So whatever I make I give it to you, so you can have your part. [Voices Overlap]

CORDERO:     Well, don't do that my love. What you have to do is, let me give you work on the side for the (customers that pay) 200. For [the] 200. I will give you 200..., 200, 250 aside, so you won't have to take that lost.

PIRELA:      I don't know. What I'm doing here, is how... [Voices Overlap]

CORDERO:     You are not supposed to take that lost.

PIRELA:      Not only that! Thinking it through, I am the fool. Because look, I put 40 and you put 40, okay, we buy a whole one. I put 10 in for the "F" or whatever, you put 10 for the "F" whatever. Okay. It gets prepared. But the one who has to sell it, it's me. What the fuck do you sell?!

CORDERO:     I don't sell, anything. You have a point, but I am not taking you for a fool either.

PIRELA:      So, what do you take me for then?

CORDERO:     Nothing!

PIRELA:      For a fool, 'cause you got me doing the whole work.

CORDERO:     Well, that is easy, my love. I will sell you some work and the "F" and you put it all together, by yourself. That's nothing!

PIRELA:      See, what an asshole you are?

CORDERO:     Oh, well what do you want me to do?

PIRELA:      Instead of telling me, "Okay, so let me help you out. Like... We are going to help you. We are going to take a couple of your clients for me..." [Voices Overlap]

CORDERO:     It's because no one buys 2 and half from me. What is it that you don't understand?

PIRELA:      So, I'm the only that they buy at 2 and half from?

CORDERO:     Apparently! You don't get it. People think that, because I'm Dominican I get the cheapest shit, ever.

46

PIRELA:       I thought you are Puerto Rican, too?

CORDERO:      I am Puerto Rican, but they know me as DOMI, they don't know
              me as freaking Puerto Rican or Bori. What do they call me?
              "DOMI! DOMI! DOMI! Ah, call the DOMI!"

PIRELA:       I don't know. I just... I just feel like I'm not making a fucking move
              here! I don't know feel like I am not going anywhere here. Because
              this time... What did I walk out with? Nothing! 'Cause I'm gonna
              give you 40 and I am going to stay with 1! With 1000 dollars!

CORDERO:      Well, I don't understand how, honey. Because that is impossible!
              That is what I don't understand.

PIRELA:       Well, if you don't understand, then neither to do I. You tell me,
              because... Every time I make money, "Come pick it up, come pick
              it up! Come pick it up, come pick it up! Come pick it up!"

CORDERO:      Let me talk to my daughter here and let me call you back.

80.     Based on my experience and knowledge of this case, in this call I believe that

PIRELA and Joel CORDERO are discussing the acquisition and sale of heroin.  I believe that

PIRELA and Joel CORDERO discuss that they both usually put in "40," likely in reference to

$40,000 to purchase heroin.  PIRELA appears to indicate that "80" ($80,000) doesn't add up (i.e.,

$80,000 is too much for a kilogram of heroin) and J. CORDERO explains that they put in "10" (in

reference to $10,000) to purchase the "F" (likely Fentanyl) and then they "grab the . . . whole piece,

in cash" (likely in reference to paying cash for a kilogram of heroin).  J. CORDERO says that

PIRELA only gave "32-5" ($32,500) this time, but that is okay because J. CORDERO still has the

"F" (likely Fentanyl).  PIRELA complains that she is hardly making any money.  PIRELA says

that she only makes "41" ($41,000) and she has to give "40" ($40,000) to J. CORDERO.  J.

CORDERO says, "Do the math, that is impossible. 375 at...at 2-50, look. . . . That's 90..."  Here,

J. CORDERO appears to be saying that if PIRELA has 375 stacks of heroin (which is mixed with

Fentanyl) and she sells the stacks at $250 per stack, then she will make more than $90,000. PIRELA complains that she is selling stacks (100 bags of heroin) to some customers for only "200" ($200) and that she is covering the $50 loss in profits with her own profits.  J. CORDERO tells PIRELA that she should sell the stacks for $250 and if she has customers who want to buy stacks at $200, then "let me give you work on the side for the (customers that pay) 200" (meaning that J. CORDERO will provide her with lesser quality heroin so that selling stacks for $200 is profitable). PIRELA complains that they (J. CORDERO and PIRELA) "buy a whole one" and it gets "prepared," but then she is "the one who has to sell it."  PIRELA again complains, "'Cause I'm gonna give you 40 and I am going to stay with 1! With 1000 dollars!," meaning that PIRELA puts in $40,000, but only makes $1,000 profit.

81.    On June 15, 2017, PIRELA texted J. CORDERO that the "Glock" should "be here (i.e., at PIRELA's residence, **Subject Premises #2**) tomorrow."  On June 16, 2017, investigators intercepted a call where PIRELA appeared to be negotiating the purchase of two firearms on J. CORDERO's behalf.  PIRELA appears to ask about the Glock and J. CORDERO says that he still wants it.  PIRELA asks if J. CORDERO wants "Both of them? The R, one too?" (likely a reference to a Rifle and a handgun) and J. CORDERO says, "Uh-huh."

82.    On June 17, 2017 between approximately 10:20pm and 10:29pm, J. CORDERO over Target Telephone 8 had the following text message communications with PIRELA using (413) 539-8561:  PIRELA: "Am calling my people and they all like it so idk what is the issue".  J. CORDERO: "idk either".   PIRELA: "Well all i can said is i will move as much as i can".  J. CORDERO "This shit is crazy".  PIRELA "It is my people are very pickey and they like it maybe bcuze of the stamp they said that". J. CORDERO: "This is what i have to deal with".  PIRELA:

"Wait until u give him the 100 to see what he says".  This text conversation between J. CORDERO and PIRELA takes place after J. CORDERO and PIRELA discussed in a phone call complaints about the quality of the heroin that they are distributing.  In this conversation, I believe that PIRELA is telling J. CORDERO that all her customers like the heroin so she does not know what issues others are having with the quality of the heroin.  J. CORDERO responds that he does not know what the problem is either and PIRELA assures him that she will move as much heroin as she can.  PIRELA then guesses that some of her customers are picky and that they may have complained about the product because of the stamp on the baggies.

83.    On June 19, 2017 investigators intercepted communications indicating that PIRELA was traveling to 280 Collins St. in Hartford to pick up 750 grams of heroin.  On June 19, 2017 at 1:41 p.m., investigators intercepted the following call between J. CORDERO using Target Telephone 8 and PIRELA using (413) 539-8561:

CORDERO:  Hello!

PIRELA:    Can I head over there?

CORDERO:  Yes, come on.

PIRELA:    Okay, where am I going to, the same place where I saw you that day?

CORDERO:  You want to go there better. Right it's better?

PIRELA:    So there?

CORDERO:  Yeah. You want me to bring your 7-50 with you?

PIRELA:    Huh?

CORDERO:  You want me to bring that 7-50 with, with..., bring it to you?

PIRELA:    Will I be taking it at once?

49

CORDERO:   Yours, yes.

PIRELA:      Will I be taking it completely?

CORDERO:   Yeah.

PIRELA:      Alright.

CORDERO:   Alright.

84.    On June 19, 2017 at approximately 2:18 p.m., investigators intercepted a call between J. CORDERO using Target Telephone 8 and PIRELA using (413) 539-8561, during which J. CORDERO directed PIRELA to 280 Collins Street, Hartford, CT (i.e., a stash location used by J. CORDERO).

85.    At approximately 2:35 p.m., J. CORDERO said, "Make sure you call me as soon as you get there, when everything is right" and PIRELA said, "I will." J. CORDERO said, "Alright, hun!" and PIRELA responded, "Bye." At approximately 3:20 p.m., PIRELA sent a text: "Bae am home". At approximately 3:21 p.m., investigators intercepted a call between J. CORDERO and PIRELA, during which they discuss, in part, the following: PIRELA: "So that work is completely ours, right?" J. CORDERO: "Everything is ours." PIRELA: "So one box is yours and box is mine?" J. CORDERO: "No, everything together is the 7-50." PIRELA: "Alright, so 3-75 and 3-75?" J. CORDERO: "Um-hum."

86.    Based on my experience and knowledge of this case, in these communications I believe that CORDERO provided PIRELA with 750 grams of heroin ("7-50"). J. CORDERO told PIRELA to come to 280 Collins St. Hartford and directed her where to park. J. CORDERO then provided her with the heroin and directed PIRELA to let him know when she gets home safely, meaning that she did not get pulled over with the heroin on the way back to her residence.

After the transaction, PIRELA texted J. CORDERO that she is home.  J. CORDERO and

PIRELA then discuss that the 750 grams together is their "work" meaning that it is their heroin

to sell together.

### EVIDENCE REGARDING RIJO-CASTILLO AND UM5769

87.     Based on intercepted calls over Joel CORDERO's phones, an unidentified male

who was utilizing 404-232-5769 (UM5769) is a source of supply of heroin and Fentanyl for Joel

CORDERO.  RIJO-CASTILLO is a transporter or a courier for UM5769.  Based on intercepted

communications between UM5769 and J. CORDERO over Target Telephone 8, UM5769

arranged for RIJO-CASTILLO to travel J. CORDERO's stash location to provide J. CORDERO

with wholesale quantities of narcotics on June 1 and 2, 2017.

88.     On June 1, 2017 at approximately 9:19 am, investigators intercepted the following

call between Joel CORDERO over Target Telephone 8 and UM5769 over 404-232-5769:

UM5769:     Tell me, brother.

CORDERO:   Yo!

UM5769:     Hello.

CORDERO:   [Aside: That's my little brother. I love that kid, forget about it]

UM5769:     Tell me, brother.

CORDERO:   Okay, listen to me. I woke up early for this. This is work, brother.
            This is not the F.

UM5769:     Okay, but is it good?

CORDERO:   It is good. I will not lie to you. It is good.

UM5769:     Are you keeping it or what? Or do I send you the other one?

CORDERO:   I will tell you the truth. I need... I can stay with it, but... I can pay
            you, but don't pay me, because I have 10 "pieces."

51

| | | |
|---|---|---|
| UM5769: | Oh, no. | |
| CORDERO: | I need F. That's what I need. | |
| UM5769: | Alright. I will send you the other then. | |
| CORDERO: | Do you understand what I'm trying to say? | |
| UM5769: | Yes, yes. | |
| CORDERO: | If you want to leave it; I will tie it up and won't even touch it. Because I have. I will pay you for it, together with the F. I will put it all there. | |
| UM5769: | Let me talk to my friend later, with the owner. I will call you back. | |
| CORDERO: | Do you understand what I'm trying to say? No, that, no... How do I tell you. I don't want to bring you down, but I do need the F. | |
| UM5769: | No, no. Don't worry that I will send it. | |
| CORDERO: | I need at least two (2) of the F to get going because I have been at a stand still all of these days. | |
| UM5769: | Alright. Okay. | |
| CORDERO: | Alright. Go on, I'll wait for you. | |

89.     Based on my experience and direct knowledge in this case, I believe that J. CORDERO is telling UM5769 that J. CORDERO received heroin from UM5769 which he will keep, but J. CORDERO is looking for Fentanyl because he has ten pieces or kilograms of heroin and is looking for something to mix the heroin with.  UM5769 assures J. CORDERO that he will send it.

90.     At approximately 3:11 p.m. J. CORDERO speaks with UM5769 who asks if "he" arrived yet and J. CORDERO states no.  Approximately 8 minutes later, J. CORDERO receives a call from RIJO-CASTILLO over 512-949-8718, who states that he is ten minutes away.  At approximately 3:30pm, investigators observed a silver Equinox arrive at 17 Edgewood St. and at

approximately the same time, RIJO-CASTILLO called Joel CORDERO and discussed the following:

> CORDERO:     That's alright, brother.  The boy will go down to the back now.
>
> RIJO-CASTILLO:     Yo! I'm here, yo!
>
> CORDERO:     Yeah, he's going down now.
>
> RIJO-CASTILLO:     Okay, bye.

91.    In this call, RIJO-CASTILLO is telling J. CORDERO he is at Edgewood St. and J. CORDERO states that the boy (Anthony ACOSTA, Joel CORDERO's drug courier and resident at Edgewood St.) will be coming down to get the Fentanyl from RIJO-CASTILLO.

92.    The following day on June 2, 2017 at approximately 11:58am, investigators intercepted the following call between Joel CORDERO utilizing Target Telephone 8 and UM5769 utilizing 404-232-5769:

> UM5769:     I told you that is all I got to say.
>
> CORDERO:     That shit, [U/I]
>
> UM5769:     [Chuckles] It hit you hard. [Voices Overlap]
>
> CORDERO:     Yes.
>
> UM5769:     Uh. I have that at hand. What is going in is. The kid... Is waiting on the wife who is working and arrives at 5:00. So imagine that...
>
> CORDERO:     That is fine. There is no problem. [Voices Overlap]
>
> UM5769:     ...What I want to tell you is that, do not worry about it. We have it in our hands.
>
> CORDERO:     That is fine then. When he heads out, you let me know.
>
> UM5769:     Uh-huh. He will head out at 5:00. After 5:00 he leaves, he should be arriving like at 7:00 or 7:30, more less.

CORDERO:       It numbed one of my sides (face) completely, crazy. I'ma have to start using a mask and all. The complete side along with the hand, man. [Voices Overlap]

UM5769:        That's what I'm telling you. So it hit you hard, then.

CORDERO:       Yeah, it hit me hard, it hit me hard. I numbed one side of the face and all.

UM5769:        Ah!

CORDERO:       I still feel the face [U/I] [Sniffles]

UM5769:        [Laughs]

CORDERO:       You know.

UM5769:        Do you notice, brother?!

CORDERO:       No, [U/I] I would have to use mask and that. I will buy masks and all that later.

UM5769:        Get working and do your little thing, there.

CORDERO:       That is fine, brother, I will call you then. [Sniffles]

UM5769:        Okay.

93.     Based on my experience and direct knowledge of this case, I believe that J. CORDERO and UM5769 are discussing the quality of the Fentanyl that J. CORDERO had obtained from UM5769 on June 1, 2017.  J. CORDERO is mixing the product and saying that his face has been numbed from the powder being dispersed in the air during the mixing/bagging process of the heroin/Fentanyl and J. CORDERO needs to wear a mask because it "hit me hard." UM5769 is assuring J. CORDERO that there is more Fentanyl and that the courier (RIJO-CASTILLO) will be arriving at approximately 7 p.m. or 7:30 p.m.

94.     On June 2, 2017 at approximately 1:21 p.m., J. CORDERO called Anthony ACOSTA and had the following conversation.

54

(Technical issues caused the conversation to be intercepted half way through)

| | |
|---|---|
| ACOSTA: | Why? |
| CORDERO: | Will be coming up later, like at 4:00, to give me the other "F" that is pending. |
| ACOSTA: | Alright. |
| CORDERO: | So I will call you when he [Audio Fades] is downstairs. |
| ACOSTA: | Alright. |
| CORDERO: | Alright. |

95.     On June 2, 2017 at approximately 7:41pm, investigators intercepted the following call between J. CORDERO and RIJO-CASTILLO using 512-949-8718:

| | |
|---|---|
| CORDERO: | Yo! |
| RIJO-CASTILLO: | Yo, I'm here down the block, bro. |
| CORDERO: | Alright, let me tell him. |
| RIJO-CASTILLO: Alright, bye | |

96.     In this call, RIJO-CASTILLO is again telling CORDERO that he has arrived at 25 Edgewood Ave. to deliver the Fentanyl.  J. CORDERO states that he will tell "him" (ACOSTA, his drug courier) to meet RIJO-CASTILLO to take possession of the Fentanyl on J. CORDERO's behalf.  At approximately 7:41p.m. J. CORDERO called ACOSTA.  J. CORDERO said," He's there already" and ACOSTA responded, "Alright."

97.     Investigators, conducting surveillance saw a black Chevrolet Equinox arrive at approximately the same time as the intercepted call.  Investigators observed that the Equinox was driven by RIJO-CASTILLO.  After leaving Edgewood Ave., investigators had a uniformed New Britain Police Office conduct a stop of the Equinox for a motor vehicle violation.  During the

stop, the officer identified the driver as Angel RIJO-CASTILLO.

98.     On or about June 5, 2017, investigators obtained an order authorizing the use of a pen register device and the disclosure of precise location information with respect to telephone number 404-232-5769 (i.e., UM5769's telephone).  The precise location information frequently put telephone number 404-232-5769 in Atlanta, GA, which is the region covered by area code "404."

99.     Investigators believe that UM5769 has dropped or stopped using 404-232-5769 and is now using 404-493-7482.  Pen register data shows that 404-232-5769 (UM5769's old telephone number) last made an outgoing call on June 21, 2017.  Pen data for RIJO-CASTILLO's telephone number (512-949-8718) shows that RIJO-CASTILLO communicated with nine different telephone numbers between June 16 and June 26, 2017.  During this time, RIJO-CASTILLO's most frequent contact was 404-232-5769 (UM5769) with 20 contacts and RIJO-CASTILLO also had 11 contacts with Target Telephone 8 (Joel CORDERO).  After June 20, 2017, RIJO-CASTILLO's telephone (512-949-8719) had no further contacts with 404-232-5769 (UM5769).  On June 21, 2017, RIJO-CASTILLO's telephone was contacted by 404-493-7482 (believed to be UM5769's new telephone) three times.

100.    On June 22, 2017 at approximately 3:39 p.m., telephone number 404-493-7482 (i.e., UM5769's new telephone) called J. CORDERO over Target Telephone 8, but no audio was recorded.  On June 25, 2017 at approximately 7:05 p.m., investigators intercepted a call between telephone number 404-493-7482 (i.e., UM5769's new telephone) and J. CORDERO over Target Telephone 8.  Based on a voice comparison of UM5769 over 404-232-5769 and the user of 404-493-7482, monitors believe that UM5769 is the person who is now using 404-493-7482.  During

56

this call, UM5769 over 404-493-7482 said, "I was calling because they need something"
meaning the J. CORDERO owes money to UM5769.  J. CORDERO said, "I think I'm going to
distribute and to see what's the most I can pick up to throw something there for you" and further
tell UM5769 that he will attempt to "gather something there for you."  In this call, I believe that
UM5769 is trying to collect from J. CORDERO money owed for a prior narcotics transaction.  J.
CORDERO tells UM5769 that he is going to sell the heroin that J. CORDERO has prepared for
sale and then give some of the proceeds to UM5769.

## EVIDENCE REGARDING VELEZ

101.    During this investigation, agents from the Federal Bureau of Investigation (FBI)
in Springfield, MA advised that Jonathan VELEZ and Heide SANTIAGO are using 314 Oak
Street, Indian Orchard, Springfield, MA as a narcotics distribution location.  FBI agents in
Springfield, MA told investigators that VELEZ is using telephone number (929) 204-1132 to
conduct his narcotics trafficking activities.  Based on Massachusetts Registration of Motor
Vehicle information, physical surveillance and intercepted calls, it appears that VELEZ and
SANTIAGO reside at 314 Oak Street, Indian Orchard, Springfield, MA.  In April 2017, an FBI
confidential informant (CI) conducted a controlled purchase of heroin from VELEZ.  VELEZ
traveled to the transaction location in a vehicle that is registered to Heide SANTIAGO at 314
Oak Street, Indian Orchard, Springfield, MA

102.    During Title III intercepts over J. CORDERO's phones (Target Telephones 7 and
8), investigators intercepted numerous narcotics-related communications between J. CORDERO,
and VELEZ using (929) 204-1132.  Based on the intercepted calls, VELEZ is selling heroin that

he obtains from J. CORDERO.  Examples of intercepted communications between J.

CORDERO and VELEZ include the following:

103.    On May 27, 2017, the following text conversation starting at approximately 3:52

p.m. occurred between J. CORDERO using Target Telephone 8 and VELEZ using (929) 204-

1132:

> CORDERO:   U ready
>
> VELEZ:   Soon ill keep u posted toss 200 but throw 100 on it so i wont mess it up
>
> CORDERO:   Do u have money to put on it
>
> VELEZ:   All my money is in work still after this time around ill buy cash n u match me but do this last favor so i can get my money up im basically paying u wit whats coming in n have my pc in work aint that what u want get u out the way first
>
> CORDERO:   Yea
>
> VELEZ:   Ok then im doing things right do that for me im putting the rest of wat i owe u so i can go see u have that ready member touch the 200 so i wont mess it up then i grab cash
>
> CORDERO   Ok

104.    Based on my experience and information developed during this investigation, in

this text conversation I believe that J. CORDERO is asking VELEZ if he is ready to purchase

more heroin.  VELEZ tells him no, but he will be soon and then asks for 300 grams, 100 of

which he wants J. CORDERO to give him free of charge.  J. CORDERO then asks if VELEZ has

any money to pay and VELEZ says no.  VELEZ says that all of his money is tied up in "work,"

meaning he has spent all his money on heroin and needs to sell it (or collect money from people

he sold it to) before he has cash.  VELEZ asks that J. CORDERO do him this favor, meaning

giving him the 300 grams of heroin, and then VELEZ will pay J. CORDERO back as soon as he starts receiving money from his heroin sales.

106.    Based on interceptions over J. CORDERO's telephone, investigators contacted members of the United States Postal Inspection Service (USPIS) regarding a parcel destined for 314 Oak Street, Indian Orchard, Springfield, MA.  On or about June 2, 2017, USPI David Lindberg intercepted a Priority Mail Express parcel addressed to Elvis SANTIAGO, 314 Oak Street, Springfield, MA 01151 and bearing sender information of Jorge RODRIGUEZ, Vega Baja, PR 00693.  On June 2, 2017, investigators intercepted numerous communications between J. CORDERO and VELEZ, and between J. CORDERO and SANTIAGO, regarding this package.  J. CORDERO told VELEZ that he needed his package and told VELEZ to pick up the package.  When the package wasn't delivered, J. CORDERO told SANTIAGO to call the post office about the package and explained that the package was addressed to "Elvis" Santiago (i.e., not Heide Santiago).  On June 5, 2017, Inspector Lindberg executed a federal search warrant for the parcel and seized 72 (100mg) vials of Xylazine 50ml, which is a horse tranquilizer that is used by narcotics traffickers as an additive or "cut" for heroin.  Intercepted calls over Target Telephone 8 revealed that J. CORDERO referred to it as "water" and used it to cut his heroin.

106.    On June 3, 2017, intercepted calls between J. CORDERO and VELEZ indicating that VELEZ was "in the back" at 25 Edgewood Ave. (i.e., which was a stash and distribution location used by J. CORDERO).  Shortly after the call, investigators intercepted the following call on June 3, 2017 at 7:21 p.m. between J. CORDERO using Target Telephone 8 and VELEZ using (929) 204-1132:

CORDERO:   That you left running and you left too fast, you didn't even let me talk to you about that. That shit is fire bro man, that's 65 bro. You heard me? [Sniffles]

VELEZ:   Yeah.

CORDERO:   Yeah, so that shit you gotta give me 13 back for that.[Sniffles]

VELEZ:   Alright what about the ..um.. I got to come back and grab the stamp. I forgot the stamp.

CORDERO:   Well you see, you moving too fast. You moving too fast and you don't know how to act with your little bread [PH].

VELEZ:   No it wasn't even that it was just that my baby was outside crying so I wanted to [U/I].

CORDERO:   Oh and you came alone? Was it that?

VELEZ:   Yeah.

CORDERO:   And why didn't you tell me, I would have went down and stood with the baby..So..

VELEZ:   Oh, no,no,no I wasn't by myself, hell no. My sister was in the car.[Voices Overlap]

CORDERO:   That's fine. [Yawns] Listen that's 13, try to... look every Saturday try to have me something.  Don't fucking skip me and come with a sob story. Whatever you can on Saturday.

VELEZ:   [Voices Overlap] I got you. I got you.

CORDERO:   At least 2...3 whatever you can, you chip it in.

VELEZ:   I got you. So you already touched it right? So I don't have to do that.

CORDERO:   That's already ready for you.

VELEZ:   Alright.

107.   Based on my experience and knowledge of this investigation, I believe that in this

call J. CORDERO is telling VELEZ that he gave VELEZ "fire" or good quality heroin that is

"65" or worth $65 per gram.  J. CORDERO then tells VELEZ that it costs 13 or $13,000 and that

VELEZ needs to start paying him back quickly and in this case at least two or three thousand

dollars by "Saturday."  VELEZ then asks if it has been "touched," meaning has the heroin been

mixed or prepared for sale already, and J. CORDERO states it already ready.  It is estimated

based on the figures quoted from J. CORDERO that VELEZ obtained 200 grams of heroin at

$65 per gram for a total amount of $13,000 owed.

## EVIDENCE REGARDING UM8415

108.    Based on intercepted calls, the unidentified male who uses telephone number 929-

303-8415 (i.e., UM8415) is a close narcotics associate of Joel CORDERO, who assists J.

CORDERO with his narcotics trafficking activities.  Examples of intercepted calls are discussed

below.

109.    On May 27, 2017 at 4:02 p.m., Joel CORDERO over Target Telephone 8 had a

conversation with UM8415 and discussed the following:

> UM8415:    Tell me!
>
> CORDERO:    When I resolve that later, because I am trying to collect the complete (money) of the "F" but I don't have forty five (45) more to give you in advance for [Stammers] another "F".
>
> UM8415:    Oh! Ah, well alright. So when are you coming?
>
> CORDERO:    No, I'm still picking up / collecting. I'm still waiting on a few people that have not hit me up. But, I am almost completing, it is. But, [Stammers] I will resolve of what I owe of the "F" from what I pick up.
>
> UM8415:    Okay, okay. No, that's alright. Go ahead. Forget about it! I will talk to them here!
>
> [Voices Overlap]

CORDERO:     But I need more of that still. So I can continue working.

UM8415:      [Audio Fades] Alright, I will talk to him!

CORDERO:     Now I have... [Stammers] I have a few people that are calling me.
             That [Stammers] they are coming to this side. They are coming to
             this side.

UM8415:      Of course, of course. I will talk to them here. Forget about it, come
             here!

CORDERO:     That is fine. So, nah... But, wait until I have the complete fifty-five
             (55). And I will tell when I go down.

UM8415:      Alright. That is fine.

CORDERO:     Alright.

110.    In this call, I believe that Joel CORDERO is telling UM8415 that he is collecting
money to pay for the previous amount of Fentanyl that he purchased from UM8415 and then tells
UM8415 that he does not have the $45,000 to pay in advance for more Fentanyl.  UM8415 tells
CORDERO not to worry about it and to come down.  UM8415 tells CORDERO to tell him when
he is coming down and CORDERO tells UM8415 that he will come when he as the full $55,000
to pay (likely the amount of money he owes UM8415).

111.    On June 13, 2017 at approximately 5:18 p.m., Joel CORDERO over Target
Telephone 8 had a conversation with UM8415 and discussed the following:

UM8415:      Tell me!

CORDERO:     Viejo (Oldy), I... I have no choice but to go back to the building,
             again.

[Pause] [Background: T.V.]

UM8415:      Ay, ay, ay. Don't joke around?

CORDERO:     Yeah. I am going to see. I am going to get an apartment there. So
             we can start working and we can finish.  [Background: T.V.]

UM8415:        What, what was that?

CORDERO:    That I'm going to get an apartment there, to, to start working, to....
So we can finish there. [Background: T.V.]

UM8415:        But, another apartment right there?

CORDERO:    In, in, in, in, in another building! Not, not where we were. In
another one, in another building. You never went to the building?
[Background: T.V.]

UM8415:        But, which one are you talking about?

CORDERO:    In the building that, that, that I, that I was in before, with "El
Gordo"?

UM8415:        Oh, you're saying change to there?

CORDERO:    Exactly. I have no other choice. I am going to go in to work. I, I
was talking to the super and the people, so he can give us another
apartment, so we can get in there and resolve. To start working,
because I am at a halt, halt and I am not doing anything.

UM8415:        Of course, of course. And when will you all go over there?

CORDERO:    Well, I'm trying to see if they give me the key today or tomorrow.
To see if we go down with the two SUV/VANS and we put
everything in there. And we fix it up, little by little. Put air
conditioner in there, whatever that needs to be done.

UM8415:        Okay, okay. You call me, then.

CORDERO:    Alright. [Voices Overlap]

UM8415:        Once, once, you are ready there, you call me.

CORDERO:    Alright.

112.    In this call, I believe that J. CORDERO is telling UM8415 that J. CORDERO has

decided to move back to 280 Collins St. (investigators know that he previously resided at

Apartment 401 in 280 Collins St.).  CORDERO describes 280 Collins St. as the building he was

in before with "El Gordo" (Gabriel CORDERO, who resides at 280 Collins St. Apt. 101).  J.

CORDERO is telling UM8415 that he is getting the keys for the apartment and that they can start working again when they move into this apartment.  Joel CORDERO was intercepted prior to this complaining that he had no place to prepare heroin because he had moved out of 25 Edgewood Ave. in New Britain, believing that someone was trying to rob him.

113.    At approximately 6:19 p.m., Joel CORDERO and UM8415 again talk and discuss the following:

CORDERO:    Tell me, man.

UM8415:    Relax, listen, I, I... but, are you ready with that, there?

CORDERO:    No, I am not ready, bro. What I'm trying to do is see if you and the people, if you all agree, that if I get that apartment, to [ya'll] go over there to the apartment.

UM8415:    Well, of course, go over there mean while and until another place comes up. [Voices Overlap]

CORDERO:    Alright, so what I am going to do is... [Voices Overlap]

UM8415:    What, what, what we have to do is, listen up... Be in that one and sleep in another one, like we did one time.

CORDERO:    Yes, that is what I was thinking! Exactly! Oh, well you remember, then! So you know what I'm talking about, the building!

UM8415:    Of course, when we were in the other one. I know. Isn't it to the other one, that you are telling me about? To Collins?

CORDERO:    Huh? To Collins, uh-huh. That one, one... You know, that one would work in one and lay down in another one, chillin.

UM8415:    Uh-huh!

CORDERO:    Well, that is fine. That is what we can do then. [Voices Overlap]

UM8415:    How [U/I] the new one? [Voices Overlap]

64

CORDERO:    So what we can do, is work in, in my brother's there, chillin. And, and, and we get our hands on it, and sleep in the new one that we get.

UM8415:    Uh-huh.

CORDERO:    It's better like that.

UM8415:    Of course and for when will we be ready, there? Because there... Tell me.

CORDERO:    Well, all I have to see is how to do this, then. Because, the SUV/VAN are full to, to move everything. So then what I'm going to do is... Let me see, about putting an air conditioner there also, it is. We must put an air conditioner there, for sure. That... That room is small. [Voices Overlap]

UM8415:    Well get your hands on it, to see if I go down tomorrow.

CORDERO:    That is fine, bro.

UM8415:    You call me.

CORDERO:    Okay.

114.      In this call, I believe that UM8415 and J. CORDERO are discussing how to use the apartment at 280 Collins St.  J. CORDERO suggests that they work with the heroin at his "brother's" meaning Gabriel CORDERO's apartment (Apartment 101 or 316) and sleep in the new one, meaning the one he is going to rent.

115.      On June 22, 2017 at approximatey 6:43 p.m., the following call was intercepted between UM8415 and Joel CORDERO:

UM8415:    I was calling you [U/I], that yours is stopped here.

CORDERO:    What?

UM8415:    To see if you were close but we talked to Carlito to see [U/I]. [Voices Overlap]

CORDERO:    Yeah they were surrounded[PH].. It was that they were

surround[PH] But here I don't know but they didn't want  to move because you know where.. where they're fixing my VAN /SUV.

UM8415:     Uh-huh.

CORDERO:     After I did the errand there, that I went over there, I went over here to the Taxi to mount everything there. But there was like a weird man.. some weird people there,  and you understand me. Then I didn't dare to move until they moved.

UM8415:     Ok , ok. [U/I] Your coming today?

CORDERO;     [Stammers]No, I'm coming later because I'm waiting for the water, I couldn't either find the water last night because I went down to look for more water.

UM8415:     Oh, ok, ok.

CORDERO:     Then what happened ..[Voices Overlap]

UM8415:     Hello?

CORDERO:     Was that they [U/I] I.. since they left I said leave now, go ahead because the people were... you know that piece there is fire, brother.

UM8415:     Of course, of course.

CORDERO;     Then I had to do the things well but then I said go ahead you guys because later I'm going to see the people of the water. They left me waiting last night.

UM8415:     Ok. [U/I] [Voices Overlap]

CORDERO:     After I leave with the water I'll go over there.

UM8415:     Ok, that's all.

116.     In this call, I believe that J. CORDERO is telling UM8415 that he is waiting to purchase more "water" which is believed to horse tranquilizer or a substance similar.  The purpose of the horse tranquilizer is to utilize it as cut or an additive to make more product or to change the quality of the heroin (i.e., make it more powerful).  J. CORDERO tells UM8415, who

66

I believe is at the stash location in 280 Collins St. in Hartford, that he will be going "over there"

(280 Collins St.) after he gets the "water" or horse tranquilizer.

117.    On June 22, 2017 at approximately 7:46 p.m., the following call was intercepted

between UM8415 and Joel CORDERO:

| | |
|---|---|
| UM8415: | Hello? |
| CORDERO: | [Background: And what is it that he said? This is what your going to rap the black guy.] |
| UM8415: | What is it? |
| CORDERO: | There's this guy in the building that he's knocking doors, he said he's from the light. Don't open him if he comes to the door. Stay on the look out. |
| UM8415: | Oh the guy.. your cousin.. your cousin? |
| CORDERO: | No I didn't say that. There's this guy who is supposedly a light worker don't open.        The door if he knocks. |
| UM8415: | Oh, ok, ok, ok., well that's fine. [Voices Overlap] |
| CORDERO: | Those are those people who knock door to door, to fix the light. |
| UM8415: | Uh-huh. |
| CORDERO: | Don't open them. |
| UM8415: | Ok. |

118.    Based on intercepted communications, I believe that UM8415 is or was staying in

J. CORDERO's current stash location at 280 Colllins St. and is helping J. CORDERO to mix and

distribute heroin.  In this call, J. CORDERO is warning UM8415 that someone is in the building

knocking on doors to check lights.  J. CORDERO is advising UM8415 not to let the worker into

the apartment.

## EVIDENCE REGARDING FIREARMS

119.    Based on our investigation, CS-4's observations and interceptions over the target telephones, I believe that members of this DTO, including Gabriel CORDERO, Joel CORDERO, Alexander PENA, Anthony ACOSTA, Fernando TOLENTINO and Amarilis PIRELA, have had possession of firearms during this investigation and likely still have access to firearms.  Evidence of members of this DTO having access to firearms includes, *inter alia*, the following:

a.      CS-4 advised that he/she observed G. CORDERO and Alexander PENA in possession of handguns at the Neighborhood Supermarket (**Subject Premises #4**).

b.      As discussed above, during a call on March 9, 2017, G. CORDERO told TOLENTINO to "get juana" in reference to a gun.

c.      During a call on March 12, 2017, G. CORDERO told TOLENTINO, "Bring Juana down.  And come over here. So you can get the gun for me there. So you can gather all those guys. So, [Stammers] you can go over there and grab all the guns from over there as well.  So when these dudes come down, we are going to start shooting each other right here." These intercepted communications indicated that TOLENTINO had access to a gun at Apartment 316 (**Subject Premises #1**) and possibly another location, and that G. CORDERO told TOLENTINO to bring the guns "down" to G. CORDERO's apartment (Apartment 101, **Subject Premises #1**).

d.      On April 3, 2017, REYES called BLUE and they discussed a fight between Joel CORDERO and Gabriel CORDERO regarding a heroin debt, during which Gabriel shot at Joel's silver Audi SUV.

e.      During a call on June 10, 2017 between J. CORDERO and ACOSTA, they

68

discussed the following:  ACOSTA: "What's up?"  CORDERO: "i left my 'toy' where you are

sitting. My 'toy' is right there."  ACOSTA: "Okay. Should I bring it down?"  CORDERO: "No,

no. Leave it there. I'll be there later."  ACOSTA: "Alright."  CORDERO: "Alright."  Based on

my training, experience and knowledge of this case, I believe that "toy" refers to a gun and that

CORDERO left his gun with ACOSTA.  This indicates that Joel CORDERO could be in

possession of a gun and that ACOSTA could have access to a weapon at his residence (**Subject**

**Premises #7**).

        f.      As discussed above, on June 16, 2017, PIRELA appeared to be discussing

with J. CORDERO that she was arranging to obtain a "Glock" and a "R" (Rifle) on behalf of J.

CORDERO.  This suggests that PIRELA and J. CORDERO could have access to one or more

guns, at either of their residences or at J. CORDERO's current stash location(s).

        g.      During the March 2, 2017 arrest of Edgar Quintana after Quintana

obtained heroin from G. CORDERO, investigators seized a firearm from Quintana's vehicle.

      120.    It is therefore reasonable to believe that multiple members of this DTO, including

Gabriel CORDERO, Joel CORDERO, Alexander PENA, Anthony ACOSTA, Fernando

TOLENTINO and Amarilis PIRELA, may maintain or have access to handguns or other firearms

in their residences or at their stash locations.

## OTHER EVIDENCE REGARDING THE SUBJECT PREMISES

### 280 Collins St., Apartment 316 (Subject Premises #1)

      121.    As discussed above, G. CORDERO and TOLENTINO have been using

Apartment 316 (**Subject Premises #1**) as a location to stash or store narcotics.  On multiple

occasions, intercepted calls revealed that G. CORDERO needed to go to Apartment 316 to obtain

heroin to sell to a customer.  TOLENTINO helps maintain and operate the stash location at

Apartment 316.  In addition, based on intercepted calls between G. CORDERO and

TOLENTINO, TOLENTINO appears to store one or more guns at Apartment 316.

122.    Further, it appears that TOLENTINO lives at Apartment 316.  For example, on

March 23, 2017 intercepted conversations indicated that TOLENTINO was exiting 280 Collins

St. to travel to the bodega (**Subject Premises #4**).  The affiant observed TOLENTINO leave the

residence and begin walking towards the bodega.  Before arriving at **Subject Premises #4,**

police stopped and identified TOLENTINO during a consensual encounter.  TOLENTINO

provided a CT identification card with the listed address of 280 Collins St., Apt. 316 (**Subject**

**Premises #1**).

123.    On June 20, 2017, May 1, 2017 and February 28, 2017, the affiant received

records from Eversource Electric Company regarding the current account holders for Apartment

316, 101 and 401 (**Subject Premises #1-#3**) at 280 Collins St.  Eversource's account holder

information showed that the billing contact information for each apartment remained the same

throughout this investigation.  The account holder for Eversource services at Apartment 316 is

Brownswell CEDANO.  CEDANO's statement history shows that since November 9, 2016 the

Eversource power bill has been listed in his name.  CEDANO is believed to be a member of this

DTO.  A confidential source who is referenced as "CS-3" identified CEDANO as an individual

who had conducted narcotics transactions that were arranged by Joel CORDERO at 280 Collins

St.  On March 26, 2017, CEDANO was arrested by the Hartford Police Department in possession

of a handgun and crack cocaine.

124.    During this investigation, TOLENTINO has been observed by investigators at and

around 280 Collins St. conducting narcotics transactions.  More recently, interceptions over Target Telephone 8 and physical surveillance have revealed that TOLENTINO continues to be at 280 Collins St. and engage in narcotics-related activities at that location.  For example, on June 19, 2017, investigators conducting surveillance observed TOLENTINO walking around the building.  Based on intercepted calls and physical surveillance, it appears that J. CORDERO has employed TOLENTINO as a "look out" whose job it is to walk around the building and look out for vehicles that may contain police or hostile drug dealers.

### 280 Collins St., Apartment 101 (Subject Premises #2)

125.    Title III intercepts, electronic surveillance, physical surveillance and public records reveal that G. CORDERO lives with his girlfriend, Eliana HERNANDEZ, at 280 Colllins St., Apartment 101 (**Subject Premises #2**).  Based on intercepted calls (which are discussed in this affidavit), G. CORDERO uses Apartment 101 to store money (narcotics proceeds), heroin and he asked TOLENTINO to bring guns down to this apartment.

126.    According to Eversource information, the current account holder for 280 Collins St., Apartment 101 is Hilda Matos.  Hilda Matos is believed to be the mother of Gabriel CORDERO.  During a home invasion at 280 Collins St., Apartment 101, G. CORDERO and MATOS identified Apartment 101 as being their home address.  On June 23, 2017, G. CORDERO reported a burglary at Apartment 101.

127.    Based on numerous physical surveillances at 280 Collins St., electronic monitoring of precise location information for G. CORDERO's cell phones and intercepted communications, throughout this investigation G. CORDERO has resided at 280 Collin St.  Investigators have conducted surveillances at 280 Collins St. and observed Gabriel CORDERO's

vehicle parked in the lot as recently as June 22, 2017 at approximately 1:30 a.m., further

CORDERO (NP)

corroborating that G. CRODERO continues to reside at 280 Collins St.  During the week of June

13, 2017, investigators intercepted calls that indicated that Joel CORDERO was moving back to

280 Collins St. (as detailed above).  J. CORDERO made reference in those calls to utilizing his

"brother's" (Gabriel CORDERO's) apartments, as well as a new apartment that J. CORDERO

was moving into.  This further corroborates that G. CORDERO continues to maintain or use

multiple apartments at 280 Collins St. (i.e., G. CORDERO's residence at Apartment 101 and G.

CORDERO's stash location at Apartment 316).

128.    Even setting aside the evidence that G. CORDERO stored narcotics and a firearm

at Apartment 101, as G. CORDERO's residence, there is probable cause to believe that

Apartment 101 will contain ample evidence of his narcotics trafficking activities, including,

among other evidence, the following: money, drug ledgers, cellular telephones, records of cell

phone services, proceeds of drug sales, evidence of money laundering, records of drug

transactions, evidence of unexplained wealth, evidence of financial transactions, items used to

process or package narcotics, records of travel, records of car rentals, names or contact

information of narcotics trafficking associates, photographs of narcotics trafficking associates,

addresses or telephone numbers in books, papers or electronic organizers, firearms, weapons,

ammunition, safes, documentary evidence of ownership of residences, vehicles, storage

containers, mail boxes and other assets, and proof of residency.

**280 Collins St., Apartment 401 (Subject Premises #3)**

129.    As discussed above, UNCLE lives at 280 Collins St., Apartment 401 (**Subject**

**Premises #3**).  UNCLE, who uses telephone number 860-478-9447, stores narcotics at **Subject**

**Premises #3** on behalf of G. CORDERO and serves heroin customers on behalf of G.

CORDERO.  Based on intercepted communications (some of which are discussed in this

affidavit), G. CORDERO, TOLENTINO and UNCLE are utilizing apartment 401 to traffic

narcotics.

130.     Eversource records show that at the time of each request for information (June 20,

2017, May 1, 2017 and February 28, 2017), Daily PENA is the payee for the electrical bill at 280

Collins St. Apt. 401.  Daily PENA is the subscriber for telephone number 860-478-9447.  This

telephone number is the number listed with the payee on the Eversource bill for electrical

services at Apartment 401.  In addition, this is the telephone number used by UNCLE.  Further,

in a call detailed below on March 1, 2017, PENA refers to UNCLE as "Daily."

131.     During a recent call over Target Telephone 8, TOLENTINO assures J.

CORDERO that a guy waiting in a car with tinted windows outside of 280 Collins St. is

"…waiting for TIO (UNCLE).  That's the one that's with TIO."  This phone call further

corroborates that UNCLE continues to reside at 280 Collins St.

### Neighborhood Supermarket, 316 Farmington Ave. (Subject Premises #4)

132.     DE LA CRUZ, BLUE, PENA, G. CORDERO, J. CORDERO and UNCLE all

seem to work at the Neighborhood Supermarket (**Subject Premises #4**) or spend significant time

at the bodega.  Moreover, the bodega has been used by members of this DTO to arrange

narcotics sales (including controlled sales of heroin to CS-4), to conduct narcotics transactions,

to store money or to store narcotics to conduct transactions at or around the bodega.  Numerous

members of this DTO – including DE LA CRUZ, PENA, G. CORDERO, J. CORDERO and

UNCLE – use the Neighborhood Supermarket to facilitate their narcotics trafficking activities.

133.    DE LA CRUZ appears to be an owner, operator or de facto leader within the

Neighborhood Supermarket (**Subject Premises #4**).  Throughout the investigation, investigators

have observed Gisel DE LA CRUZ utilizing a white Range Rover, which was observed at

**Subject Premises #4** as recently as June 23, 2017.

### 104 Wood Dr., East Hartford, (Subject Premises #5)

134.    DE LA CRUZ and BLUE are in a relationship.  Both DE LA CRUZ and BLUE

reside at 104 Wood Dr. East Hartford (**Subject Premises #5**) and work at 316 Farmington Ave.

Hartford, Neighborhood Supermarket (**Subject Premises #4**).  Throughout the investigation,

investigators have observed Gisel DE LA CRUZ utilizing a white Range Rover which was

observed at **Subject Premises #4** as recently as June 23, 2017 and the same Range Rover that

investigators have observed Gisel DE LA CRUZ driving and BLUE as a passenger in, has been

observed at **Subject Premises #5** as recently as June 23, 2017.  A response to a subpoena to

Eversource Electrical Company on June 20 2017 showed that the current customer at **Subject**

**Premises #5** is Karina PENA, who is believed to be the daughter of Gisel DE LA CRUZ.

135.    As their residence, there is probable cause to believe that 104 Wood Drive, East

Hartford (**Subject Premises #4**) will contain ample evidence of their narcotics trafficking

activities, including, among other evidence, the following: money, drug ledgers, cellular

telephones, records of cell phone services, proceeds of drug sales, evidence of money laundering,

records of drug transactions, evidence of unexplained wealth, evidence of financial transactions,

items used to process or package narcotics, records of travel, records of car rentals, names or

contact information of narcotics trafficking associates, photographs of narcotics trafficking

associates, addresses or telephone numbers in books, papers or electronic organizers, firearms,

weapons, ammunition, safes, documentary evidence of ownership of residences, vehicles,

storage containers, mail boxes and other assets.

### 212 Greenwood St., East Hartford, CT (Subject Premises #6)

136.    Alexander PENA is also an employee at the Neighborhood Supermarket (**Subject**

**Premises #4**) and resides at 212 Greenwood St. (**Subject Premises #6**).  A response to a

subpoena to Eversource Electrical Company on June 20 2017 showed that the current customer

at **Subject Premises #6** is "Alexander PENNA Jr."

137.    On May 30, 2017, investigators conducted surveillance of BLUE at **Subject**

**Premises #5** and Alexander PENA at **Subject Premises #6**.  At approximately 3:15 p.m.,

investigators observed a Honda Pilot bearing CT registration 951YBH parked in the driveway of

212 Greenwood Street, East Hartford.  At approximately 3:34 p.m., investigators observed

Alexander PENA and his girlfriend, Bethzaida DAVILA, exit the residence and enter into a

Honda Pilot.  Investigators observed the Honda Pilot exit the driveway at 212 Greenwood Street,

East Hartford **(Subject Premises #6)** and travel to 104 Wood Drive, East Hartford, CT (the

known residence of Gisel DE LACRUZ and BLUE).  At approximately 3:54 p.m., investigators

observed BLUE exit 104 Wood Drive (**Subject Premises #5**) and get into the rear seat of the

Pilot.  Investigators followed the Pilot, as it traveled to Farmington Ave in Hartford, CT.  Once

on Farmington Ave, investigators observed Blue exit the vehicle and enter into a nearby Boost

Mobile Store, located at 260 Farmington Ave, Hartford, CT.  As Blue exited the vehicle, the

vehicle was observed continuing on to the Neighborhood Supermarket which was just down the

road from the Boost Mobile Store.  As the Honda Pilot arrived at the Neighborhood

Supermarket, an investigator utilizing electronic surveillance (a pole camera) observed the

Honda Pilot pull into the rear of the Neighborhood Supermarket. Minutes later the investigator observed Alexander PENA and Bethzaida DAVILA walking up the alley way towards the front of the Neighborhood Supermarket. On or about June 27, 2017, an investigator conducting physical surveillance in the area of 212 Greenwood St. saw PENA at that location.

138.   As his residence, there is probable cause to believe that 212 Greenwood St. (**Subject Premises #6**) will contain ample evidence of his narcotics trafficking activities, including, among other evidence, the following: money, drug ledgers, cellular telephones, records of cell phone services, proceeds of drug sales, evidence of money laundering, records of drug transactions, evidence of unexplained wealth, evidence of financial transactions, items used to process or package narcotics, records of travel, records of car rentals, names or contact information of narcotics trafficking associates, photographs of narcotics trafficking associates, addresses or telephone numbers in books, papers or electronic organizers, firearms, weapons, ammunition, safes, documentary evidence of ownership of residences, vehicles, storage containers, mail boxes and other assets.

### Edgewood Ave., Apt. 203, New Britain, CT (Subject Premises #7)

139.   Anthony ACOSTA and Carmen NIEVES a.k.a Carmen ACOSTA are believed to be married and reside at 25 Edgewood Avenue, Apartment 203, New Britain, CT (**Subject Premises #7**). According to open source databases and NIEVES's license, her residence is **Subject Premises #7**. NIEVES and ACOSTA were stopped on March 24, 2017 after they were seen meeting with Gabriel CORDERO at 280 Collins St. Hartford. ACOSTA and NIEVES provided photograph identification and were ultimately not arrested. Investigators have compared their photographs to photographs on the respective social media pages for the names

76

Anthony ACOSTA and Carmen ACOSTA.  Carmen ACOSTA's Facebook page showed

photographs of Carmen NIEVES and states Carmen ACOSTA married Anthony ACOSTA in

2016.  Further, on Anthony ACOSTA's Facebook page, there are photographs of Carmen

NIEVES and Anthony ACOSTA cutting a cake together during what appears to be a wedding.

On June 20, 2017, Carmen ACOSTA's Facebook page showed a photograph of a young child

sitting out front of 25 Edgewood Ave. New Britain.

     140.    As discussed above, ACOSTA conducted controlled sales of heroin to CS-4 at 25

Edgewood Ave.  In addition, ACOSTA received heroin shipments, and conducted heroin

transactions, at 25 Edgewood Ave. on behalf of J. CORDERO.  A subpoena responded to by

Eversource Electrical Company on June 20, 2017 showed that the current customer at **Subject**

**Premises #7** is "Carlos L Bonilla," but lists the telephone number as 860-829-7780.  This

telephone number has been used by Anthony ACOSTA during controlled purchases and

intercepted communications with Joel CORDERO.

     141.    As his residence, there is probable cause to believe that 25 Edgewood Ave.,

Apartment 203, New Britain, CT (**Subject Premises #7**) will contain ample evidence of his

narcotics trafficking activities, including, among other evidence, the following: money, drug

ledgers, cellular telephones, records of cell phone services, proceeds of drug sales, evidence of

money laundering, records of drug transactions, evidence of unexplained wealth, evidence of

financial transactions, items used to process or package narcotics, records of travel, records of

car rentals, names or contact information of narcotics trafficking associates, photographs of

narcotics trafficking associates, addresses or telephone numbers in books, papers or electronic

organizers, firearms, weapons, ammunition, safes, documentary evidence of ownership of

residences, vehicles, storage containers, mail boxes and other assets.

### 755 Main Street, Unit C, Meriden, CT (Subject Premises #8)

142.    Based on intercepted communications, information obtained from CT state probation, physical surveillance, motor vehicle information and precise location information for cellular telephones used by J. CORDERO, J. CORDERO currently resides at 755 West Main Street, Unit C, Meriden, CT.  During interceptions over Target Telephone 7, Joel CORDERO received an incoming text on May 15, 2017 at approximately 1:12 a.m. from an unknown male utilizing 646-428-4189 saying "I'm here".  J. CORDERO immediately responds "Ok".  J. CORDERO made an outgoing call at approximately 1:16 a.m., but it was unmonitored and thus unrecorded.  Approximately 2 minutes later, J. CORDERO texts "775 west main st ,meriden ct". At approximately 1:35 a.m., J. CORDERO received a text message from an unknown male utilizing 646-923-3179 asking "The address".  Approximately one minute later, J. CORDERO responds by forwarding the same text he sent to 646-428-4189: "Fwd: 775 west main st ,meriden ct".

143.    Based on precision location information obtained from telephone numbers utilized by Joel CORDERO, investigators have observed that J. CORDERO spends numerous nights and early mornings in the area of 775 West Main St. Meriden, CT (**Subject Premises #8**). Investigators have conducted surveillance of 775 West Main St. Meriden, CT and have seen two cars utilized by J. CORDERO parked at the residence on numerous occasions.  Specifically, on June 26, 2017, an investigator observed a white Honda Pilot utilized by Joel CORDERO parked in the lot.  A check of the Connecticut State Probation System shows that Joel CORDERO is currently using 775 West Main St. Meriden, CT, Unit C (**Subject Premises #8**) as his address.

Throughout the last month of this investigation, investigators have observed Joel CORDERO also utilizing a blue Nissan Altiman bearing CT registration 9ALFA1. This vehicle is registered to Naldi L. Santiago (address on registration 12 Dogwood Rd., Wethersfield, CT). The utilities for 775 West Main St., Unit C, Meriden, CT are in the name of Naldi L. Santiago.

144.     As his residence, there is probable cause to believe that **Subject Premises #8** will contain evidence of J. CORDERO's narcotics trafficking activities, including, among other evidence, the following: money, drug ledgers, cellular telephones, records of cell phone services, proceeds of drug sales, evidence of money laundering, records of drug transactions, evidence of unexplained wealth, evidence of financial transactions, items used to process or package narcotics, records of travel, records of car rentals, names or contact information of narcotics trafficking associates, photographs of narcotics trafficking associates, addresses or telephone numbers in books, papers or electronic organizers, firearms, weapons, ammunition, safes, documentary evidence of ownership of residences, vehicles, storage containers, mail boxes and other assets.

## III.     <u>GENERAL INFORMATION REGARDING DRUG TRAFFICKING</u>

145.     During my tenure as a law enforcement officer, I have investigated and participated in numerous operations which involved, in part, drug trafficking violations, the flow of the illegal proceeds obtained from drug trafficking, and related offenses such as violations of firearms laws. My involvement in these investigations has resulted in the successful prosecution of numerous individuals and the forfeiture of assets purchased with the proceeds from unlawful drug trafficking, as well as assets used to facilitate these violations. Search warrants relating to these investigations have covered vehicles, businesses and residences of drug traffickers and

their co-conspirators.  In addition, these search warrants have also covered "stash houses" used as storage and distribution points for controlled substances and US currency used by drug dealers for their unlawful drug trafficking activities.

146.   Materials searched for and recovered in these locations have included various controlled substances; drug paraphernalia; books and records reflecting drug sales, the transfer or transportation of drugs and amounts of monies owed for drugs, records reflecting the names, addresses, and telephone numbers of co-conspirators, sales receipts and other records reflecting the expenditure of monies that are proceeds from unlawful drug distribution; currency and money wrappers; records of bank transactions made to conceal and launder drug trafficking proceeds; cellular telephones, paging devices, computers and computer disks, answering machines; and various valuable assets such as real property and automobiles that were purchased with the proceeds of unlawful drug trafficking.  These items obtained during the executions of said search warrants, has constituted evidence of drug violations, the acquisitions of assets with drug trafficking proceeds, and the use of the assets to facilitate drug trafficking violations.

147.   Based on my training, experience and participation in this and other drug trafficking investigations, I know that:

a.   drug traffickers often place assets in the names other than their own to avoid detection of these assets by law enforcement;

b.   drug traffickers often place assets in the names of businesses and corporate entities as nominee title holders in order to avoid detection of these assets by law enforcement;

c.   even though these assets are placed in the names of other persons or

entities, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

        d.     drug traffickers must maintain and have quick access to large amounts of United States currency, foreign currency, or other liquid assets in order to maintain and finance their ongoing drug business; these materials, as well as records, generally described below, are often kept and maintained within premises controlled or used by the drug traffickers within safes or lock boxes;

        e.     drug traffickers maintain in their residences computerized or written books, records, receipts, diaries, ledgers, calendars, personal telephone/address books, airline tickets, airline schedules and airline receipts, cashier's checks, money orders, telephones with memory capabilities, telephone answering machines and telephone answering tapes, and other papers relating to the transportation, ordering, sale and distribution, of controlled substances and the outstanding debts and collections from controlled substances that have been distributed; these materials are often maintained within the electronic memory of personal computers, I-Pads or other computerized tablets, external hard drives, memory cards and "thumb drives" kept and maintained at premises under the control of the drug traffickers;

        f.     drug traffickers commonly provide narcotics on consignment sale to their customers, who subsequently pay for the drugs after reselling the drugs.  Therefore the above mentioned books, computerized records, records, receipts, notes, ledgers, et cetera, will be secured by the drug traffickers within their residences for their ready access to them for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

        g.     drug traffickers commonly conceal contraband, proceeds of drug

transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone and beeper numbers of drug associates within their residences, for ready access and to conceal them from law enforcement agencies;

      h.     drug traffickers commonly maintain records reflecting names, nicknames, addresses, and telephone numbers of both their current and past drug associates;

      i.     drug traffickers who are aware of an ongoing criminal investigation will often destroy an existing format of records reflecting their drug transactions.  However, it is common for drug traffickers, particularly traffickers who provide or receive drugs on a consignment basis, to create another type of drug record to assist the trafficker in the collection of drug debts;

      j.     drug traffickers commonly use their homes to store records and/or receipts reflecting the collection of drug debts and the distribution of controlled substances, as well as records and receipts reflecting the expenditure of drug proceeds for personal and business assets;

      k.     drug traffickers will commonly conceal within their residences or within the curtilage of their residences, quantities of narcotics, large amounts of currency, firearms, financial instruments, jewelry, electronic equipment and other items of value and proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, and spending large sums of money derived from drug trafficking;

      l.     drug traffickers will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services such as safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate and business fronts;

m.      persons involved in drug trafficking who are aware of a criminal investigation into their financial drug activities, will conceal, liquidate, and transfer easily movable drug derived assets in order to prevent law enforcement agencies from seizing and forfeiting their assets;

n.      drug traffickers often have photographs, slides, or video movies of themselves, their co-conspirators and the property and assets purchased with drug proceeds. These photographs and video movies are normally in the drug traffickers possession or residence;

o.      The State of Connecticut is generally viewed as a consumer state in regards to narcotic activity.  However it is common for drug traffickers to travel to major distribution centers such as New York to purchase their narcotics for distribution.  It is known that after purchasing these narcotics, drug traffickers will transport these narcotics or cause them to be transported to those areas in which they will be distributed to their customers.  It is known that drug traffickers' methods include, but are not limited to:  commercial airlines, private motor vehicles, tractor trailer units, public transportation, and motor vehicles with concealed compartments, and government and contract mail carriers.  It is known that the residences of drug traffickers will often contain records of drug related travel.  These records may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel;

p.      based on my training and experience, drug traffickers commonly have firearms and other weapons in their possession, in their cars, on their person, at their residence including, but not limited to handguns, rifles, shotguns,  automatic weapons, and knives.  These

83

firearms and weapons are most often kept to protect and secure drug traffickers' property;

        q.     based on my training, experience and participation in this and other drug

trafficking investigations, I know that it is generally a common practice for drug traffickers to

store their drug inventory and drug related paraphernalia in their residences, cars or those of

trusted associates.  This paraphernalia frequently includes scales, funnels, sifters, grinders,

plastic bags, heat sealing devices, and dilutant;

        r.     based on my training and experience, drug dealers often create secret

locations, commonly called "traps," in their automobiles.  Often, drug dealers will use these

automobiles to store narcotics, weapons, money and other items and documents related to their

drug trade; and

        s.     based on my training, experience and participation in this and other drug

trafficking investigations, I know that drug traffickers often possess, maintain and control other

items related to their drug trafficking activities, as described in Attachment A to this affidavit, in

their cars, homes, garages and out-buildings, and in safes or lock boxes maintained at such

locations.

## IV.   **CONCLUSION**

     148    On the basis of the foregoing information, there is probable cause to believe, and I

do believe, that during the periods set forth above Henry CARABALLO, Alexander PENA,

Gabriel CORDERO, Fernando TOLENTINO Jr. a.k.a "HUMACAO," Gisel DE LA CRUZ,

BLUE, Edwin REYES, Joel CORDERO, Anthony ACOSTA, Amarilis PIRELA; Angel RIJO-

CASTILLO; UM5769, Jonathan VELEZ and UM8415 conspired to possess with intent to

distribute and to distribute heroin, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and possessed

with intent to distribute and distributed heroin, in violation of 21 U.S.C. § 841(a)(1).

149    There is also probable cause to believe, and I do believe, that the items described

in Attachment A, which are fruits, instrumentalities and evidence of these crimes will be found at

(1) 280 Collins Street Apartment 316 Hartford, Connecticut (**Subject Premises #1**); (2) 280

Collins Street Apartment 101 Hartford, Connecticut (**Subject Premises #2**); (3) 280 Collins

Street Apartment 401 Hartford, CT (**Subject Premises #3**); (4) Supermarket 316 Farmington

Avenue Hartford, CT (**Subject Premises #4**); (5) 104 Wood Drive East Hartford, CT (**Subject

Premises #5**); (6) 212 Greenwood St. East Hartford, CT (**Subject Premises #6**); (7) 25

Edgewood Avenue Apartment 203 New Britain, CT (**Subject Premises #7**); and (8) 775 West

Main Street, Unit C Meriden, CT (**Subject Premises #8**).

150    Because this is an application that pertains to an ongoing criminal investigation,

and because disclosure of the information contained herein as well as disclosure of the warrants

and complaints being requested herein may compromise the investigation and increase the risk of

harm for the law enforcement officers responsible for conducting the arrests and searches, I

request that the warrants, applications, complaints and this affidavit be ordered sealed by the

Court, until further order of the Court.

151    Investigators have developed other evidence during this investigation that

CORDERO and his associates possess and use firearms.  This evidence includes, *inter alia*, the

above-discussed intercepted call in which PIRELA appears to be arranging or negotiating the

acquisition of two firearms for CORDERO, CS-4 advising that he/she had seen PENA and G.

CORDERO possessing firearms at **Subject Premises #4**, the intercepted calls where G.

CORDERO tells TOLENTINO to bring the guns down to his apartment, and the intercepted call

between BLUE and REYES, during which they discussed Joel CORDERO and his brother, Gabriel CORDERO, getting into a fight, during which Gabriel CORDERO shot at CORDERO's car.  In light of this evidence regarding the possession and/or use of firearms, the serious nature of the crimes alleged in the affidavit and the fact that the individuals that are the subject of this investigation are believed to have engaged in high-level or high-volume heroin trafficking (in which often times drugs and weapons are found together), in order to ensure the safety of the agents and officers executing the requested warrants, I respectfully request that the Court authorize execution of all warrants at any time of the day or night.

152    In addition, I respectfully request that the Court authorize investigators to execute the search warrants for the apartments located at 280 Collin St., Hartford, CT (i.e., **Subject Premises #1, #2 and #3**) without "knocking and announcing."  During this investigation, investigators have intercepted communications indicating that members of this DTO have used human counter-surveillance at 280 Collin St., vide counter-surveillance at 280 Collins St. and have fortified doors to one or more apartments at 280 Collins St. to thwart law enforcement (or rival drug dealers) from entering the building at 280 Collins St. (or the subject apartments within 280 Collins St.) without detection.  One of the very first things that Joel CORDERO did after getting a new apartment at 280 Collins St. was to employ a male to obtain lumber and brackets in what myself and other investigators believe to be an attempt to fortify the apartment doors for his apartment at 280 Collins St.  In addition, given the intercepted calls between G. CORDERO and TOLENTINO indicating that they possess or have access to guns at one or more apartments at 280 Collins St., investigators believe that the apartments at 280 Collins St. present a unique danger to law enforcement personnel who attempt to serve both arrest warrants and search

86

warrants at 280 Collins St.  In addition, if the doors to one or more apartments are fortified, this would give the occupants of the apartment an opportunity to destroy evidence.  Accordingly, I respectfully request that the Court authorize investigators to execute the search warrants at the three apartments at 280 Collin St. without requiring investigators to knock on the door, announce their presence and then wait a reasonable period of time before entering.

Matthew Kowalczyk
Task Force Officer
Drug Enforcement Administration

Subscribed and Sworn to before me
this _28th_ day of June, 2017.

/s/ RAR

HON. ROBERT A. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

87